No. 85-116

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

STATE OF MONTANA,

      Plaintiff and Appellant,

-vs-

MICHAEL CARNEY,

      Defendant and Respondent.

---

APPEAL FROM: District Court of the *Eighteenth* ~~Second~~ Judicial District,
In and for the County of ~~Silver Bow~~, *Gallatin*
The Honorable Joseph Gary, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Hon. Mike Greely, Attorney General, Helena, Montana
        A. Michael Salvagni, County Attorney, Bozeman,
        Montana
        James D. McKenna argued, Deputy County Attorney,
        Bozeman, Montana

    For Respondent:

        Mike Sand argued, Bozeman, Montana

---

           Submitted:   November 27, 1986

           Decided:   January 16, 1986

Filed: JAN 16 1986

---

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Michael Carney, defendant, was charged with driving while under the influence of alcohol and with two counts of negligent homicide. During the second day of trial, the Gallatin County District Court sustained defendant's objection to the admissibility of blood samples because the State failed to establish a proper chain of custody. The State advised the court that they desired to appeal its decision. The Court dismissed the jury. The State appeals. We dismiss the appeal and remand to the District Court with directions that the charges be dismissed with prejudice.

The issues are:

1. Was the order ruling the blood samples inadmissible for failure to lay a proper foundation appealable?

2. Do the double jeopardy clauses of the United States Constitution and the Montana Constitution prohibit a retrial of the defendant?

On June 11, 1982, defendant was involved in an automobile accident in which two persons were killed near West Yellowstone. Shortly after the accident, defendant was transported by ambulance to Ashton Memorial Hospital in Ashton, Idaho. The investigating highway patrolman called the hospital and requested a blood sample for alcohol testing purposes. A qualified lab technician at the hospital drew samples at 11:00 p.m. and 12:00 midnight. She placed the two samples in separate vials and sealed them. She wrote on each vial the defendant's name, the date, and the time each blood sample was taken.

The lab technician delivered the blood samples in a paper sack to the ambulance driver. The driver did not look inside the sack containing the blood samples. He could not

2

testify as to the manner of sealing. He merely took the paper sack from Ashton, Idaho to West Yellowstone, Montana. When he was unable to locate the highway patrolman, the ambulance driver put the sack containing the samples on the police dispatcher's desk. That took place at approximately 1:00 a.m.

At approximately 1:00 p.m. or 12 hours later, the highway patrolman picked up the samples from the police dispatcher's desk. The patrolman testified the two vials were in a stapled sack inside a sealed manila envelope. The patrolman opened the envelope and the sack and found the two vials of blood. He testified he did not open the seals on the vials. He placed the vials in a mailing container furnished by the Montana State Crime Investigation Laboratory and sent them to the laboratory for testing.

The State was unable to explain the actual custody of the blood samples during the approximately 12 hours between the time the samples were left at the police dispatcher's desk until they were picked up from the same desk by the highway patrolman. This was the crucial factor in the order of the District Court.

The head of the Alcohol Section at the State Crime Laboratory testified that both vials were still sealed when he received them, that he removed the seals, and that the blood alcohol test was run under his supervision. He emphasized that the seals had not been broken. In the course of this examination, the State moved for the admission of the blood sample vials. At that point, the defense counsel made the following objection:

> Your Honor, I am going to object to the introduction of those exhibits and any testimony relating to them on the basis of foundation, specifically, there hasn't been a proper chain of custody laid, therefore no foundation.

3

Outside of the presence of the jury, extensive testimony was presented to the District Court judge with regard to the blood samples and the results of the tests. This was followed by extensive argument on the part of counsel. The court then made the following ruling:

> I'm going to sustain the objection and I'm not going to admit it on the basis and fact there is no chain from the period he left Frankie Harringfeld [the laboratory technician]. Mr. Costello is an ambulance driver and not a police officer. He takes the sample to the dispatcher and they put the thing on the desk. The officer testified that he didn't even pick it up from the dispatcher but right on the desk there.
>
> [I]t bothers me with two people dead, the officer can't even go down to Idaho to pick up this sample when that's what they are trained to do, so I'm going to sustain the objection and refuse to admit it.

When the county attorney advised that the State desired to appeal the ruling of the District Court, the court pointed out that this would raise a question of double jeopardy. That element was discussed by the county attorney and by defense counsel. Notwithstanding that discussion, the county attorney concluded that it was advisable to appeal the order. The District Court dismissed the jury in the following language:

> Ladies and gentlemen of the jury, I would like to advise you that I have made a ruling contrary to the State's position and they are going to appeal the case to the Supreme Court, therefore, you are dismissed. I wish to thank you for your attention and the care with which you have given this case. I'm sorry you cannot go to the conclusion but that is the decision of the county attorney, so you are dismissed.

Our two issues are whether the ruling that the blood samples are inadmissible as evidence is an appealable order, and whether the double jeopardy clauses prohibit a retrial of the defendant. Because these issues are interwoven, we will discuss them together.

4

With regard to the issue on the right to appeal from the evidentiary ruling, both parties agree that the State's right of appeal, if any, is controlled by § 46-20-103, MCA:

Scope of appeal by state. (1) Except as otherwise specifically authorized, the state may not appeal in a criminal case.

(2) The state may appeal from any court order or judgment the substantive effect of which results in:

(a) dismissing a case;

(b) modifying or changing the verdict as provided in 46-16-702(3)(c);

(c) granting a new trial;

(d) quashing an arrest or search warrant;

(e) suppressing evidence;

(f) suppressing a confession or admission; or

(g) granting or denying change of venue.

With reference to subsection (e) of the statute, the State argues that the term "suppressing evidence" should be broadly construed. The State contends that the statute applies to all rulings excluding evidence which substantially impair the State's case, as well as to the suppression of evidence which has been illegally obtained. See State v. Newman (Kan. 1984), 680 P.2d 257. The State argues that the order effectively suppressed significant evidence and is therefore appealable.

The defendant objected to the admission of the blood samples because of the failure to lay a proper foundation, specifically because of the failure to prove a proper chain of custody. The District Court sustained that objection. Defendant contends that the evidentiary ruling by the District Court does not fit within the statutory exceptions which allow an appeal.

Section 46-20-103, MCA, does not distinguish between appeals made prior to the commencement of trial (pre-trial)

5

and appeals taken in the course of trial (mid-trial). We must carefully distinguish between pre-trial and mid-trial appeals. Mid-trial criminal appeals raise the constitutional question of double jeopardy. Pre-trial appeals do not raise such an issue. Because this is a mid-trial appeal, we must analyze the double jeopardy aspect of such an appeal.

The fifth amendment of the United States Constitution and art. II, sec. 25 of the Montana Constitution prohibit an individual from being twice put in jeopardy for the same offense. The policy considerations for this fundamental right were stated by the United States Supreme Court in United States v. Jorn (1971), 400 U.S. 470, 479:

> The Fifth Amendment's prohibition against placing a defendant "twice in jeopardy" represents a constitutional policy of finality for the defendant's benefit in federal criminal proceedings. A power in government to subject the individual to repeated prosecutions for the same offense would cut deeply into the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial. And society's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in enforcement of criminal laws.

In a jury trial, jeopardy attaches when the jury is empaneled and sworn. Crist v. Bretz (1978), 437 U.S. 28. It is undisputed that jeopardy had attached prior to dismissal in this case.

A second criminal trial is barred unless there was a "manifest necessity" to terminate the trial or defendant acquiesced in the termination. See W. LaFave & J. Israel, Criminal Procedure §24.1(d) at 901 (1985). "Manifest necessity" has been explained by the United States Supreme Court as follows:

> Under the [manifest necessity] rule a trial can be discontinued when particular circumstances manifest a necessity for so

6

> doing, and when failure to discontinue
> would defeat the ends of justice.

Wade v. Hunter (1949), 336 U.S. 684, 690.

> . . . Indeed, it is manifest that the key
> word "necessity" cannot be interpreted
> literally; instead . . . we assume that
> there are degrees of necessity and we
> require a "high degree" before concluding
> that a mistrial is appropriate.
>
> The question whether that "high degree"
> has been reached is answered more easily
> in some kinds of cases than in others.
> At one extreme are cases in which a
> prosecutor requests a mistrial in order
> to buttress weaknesses in his evidence.
> Although there was a time when English
> judges served the Stuart monarchs by
> exercising a power to discharge a jury
> whenever it appeared that the Crown's
> evidence would be insufficient to
> convict, the prohibition against double
> jeopardy as it evolved in this country
> was plainly intended to condemn this
> "abhorrent" practice . . .
>
> Thus, the strictest scrutiny is
> appropriate when the basis for the
> mistrial is the unavailability of
> critical prosecution evidence, or when
> there is reason to believe that the
> prosecutor is using the superior
> resources of the State to harass or to
> achieve a tactical advantage over the
> accused.
>
> At the other extreme is the mistrial
> premised upon the trial judge's belief
> that the jury is unable to reach a
> verdict, long considered the classic
> basis for a proper mistrial . . .

Arizona v. Washington (1978), 434 U.S. 497, 506-09. We approve and adopt the preceding explanations of "manifest necessity" given in Wade and Arizona.

In considering whether or not the facts of this case meet the statutory definition of suppression of evidence, the claimed necessity for granting an appeal must be balanced against and harmonized with the defendant's fundamental rights under the double jeopardy clauses of the United States and Montana Constitutions.

7

In seeking to determine whether there was a "manifest necessity" to discontinue the trial and allow an interlocutory appeal, the court must exercise the power to discharge a jury "with the greatest caution, under urgent circumstances, and for plain and obvious cases." See Wade v. Hunter (1949), 336 U.S. 684, 690, citing United States v. Perez (1824), 6 U.S. 165. Under that standard, a trial should be discontinued with great caution.

Does an adverse evidentiary ruling based upon the failure to prove a chain of custody constitute manifest necessity? We conclude that as a general rule, a ruling on the admission of evidence which is adverse to the State does not constitute an urgent circumstance or a plain and obvious case constituting manifest necessity.

Is there something unique about the facts of the present case which prohibits the application of that general principle? The objection to the admission of evidence was based upon the lack of a foundation because of the failure to prove a proper chain of custody. The objection was sustained by the District Court. These facts do not suggest a plain and obvious case warranting an appeal, nor do they describe an urgent circumstance. The prosecution had an adequate opportunity to present the question of admissibility in a pre-trial motion. They did not exercise that choice. We conclude that the State has failed to show a "manifest necessity" for discontinuing the trial and initiating the interlocutory appeal.

We conclude that the order sustaining the objection to the admission of evidence did not constitute "suppressing evidence" as defined in § 46-20-103, MCA. We hold that the District Court order ruling the blood samples inadmissible

8

for failure to lay a proper foundation was not an appealable order.

Because the State has failed to meet the standard of "manifest necessity," we further conclude that it would be constitutionally impermissible to again place the defendant in jeopardy. We hold that a further trial of the defendant for the same offenses would constitute double jeopardy.

The appeal of the State of Montana is dismissed. The cause is remanded to the District Court for the dismissal of the charges against the defendant with prejudice.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

9