JUSTICE NELSON,
dissenting.
¶42 I dissent. Although I agree with the Court’s recitation of the well-established legal principles, I strenuously disagree with the Court’s application of those principles to the factual circumstances presented *53 here. Moreover, I believe the Court elevates form over substance and overlooks critical facts bearing on the issue of whether Cates consented to or waived his right to object to the termination of his trial.
¶43 I begin by reviewing the circumstances which existed at the time the District Court terminated the trial. It was the third day of trial. Part of Cates’ defense was that the prosecution had misrepresented the statements he made to Officer Danzer. Indeed, Cates did not believe he had “confessed” to anything, and he planned to use the videotape of the interrogation in lieu of testifying and for the purpose of challenging the State’s case. That morning, K.K. testified that she and Cates had nonconsensual sex “over the entire period” of their relationship, though the Amended Information alleged only two specific instances of nonconsensual sex with K.K. Defense counsel promptly objected and moved for a mistrial, an appropriate course of action in order to preserve this issue for appeal. See Citizen Advocates For A Livable Missoula v. Missoula City Council, 2006 MT 47, ¶ 35, 331 Mont. 269, 130 P.3d 1259 (“It is well established that this Court will not review an issue that was not raised in the district court.” (internal quotation marks omitted)); State v. Gomez, 2007 MT 111, ¶ 21, 337 Mont. 219, 158 P.3d 442 (“The rule is well established that this Court will not address an issue raised for the first time on appeal.”). Later, Cates argued that K.K.’s testimony that she had been told by the prosecutor to tell “the truth, the whole truth, and nothing but the truth” was also grounds for a mistrial.
¶44 Meanwhile, during the lunch recess, the prosecution reached the conclusion that certain evidence it intended to introduce at trial (Cates’ alleged confession) was not admissible under State v. McKee, 2006 MT 5, 330 Mont. 249, 127 P.3d 445, a case decided by this Court 11 months earlier. This put the State in a predicament because one of the prosecutors had mentioned this evidence to the jury in his opening statement. Moreover, the prosecution had assumed it could use Cates’ “confession” and, thus, had not sent S.C.’s rape kit and the used condom recovered from K.K.’s residence to the State Crime Lab. The prosecutors acknowledged that Cates had not moved to suppress his statements to Danzer. Nevertheless, believing they could not introduce those statements, the prosecutors sought to abort the trial and start over.
¶45 The District Court decided that Cates had not presented proper grounds for a mistrial and accordingly refused to grant his motions. However, the court decided that it was necessary nonetheless “to stop a trial which was in a position where the existence of an alleged *54 confession had been repeatedly made known to the jury, yet the evidence about that confession was inadmissible pursuant to McKee.” Although Cates had not objected to the prosecution’s references to his alleged confession or contended that his statements to Danzer were inadmissible, the court nevertheless felt that the “particular circumstances surrounding the numerous references to confession and the inadmissibility of that confession created a legal pivot point” which required termination of the trial. The court thus, sua sponte, declared a mistrial for the reasons argued by the prosecutors.
¶46 As an aside, I note the Court’s contentions that Cates had two mistrial motions “on the table” at the time the District Court decided to declare a mistral sua sponte, Opinion, ¶ 39, and that Cates’ counsel could have “withdrawn their previous motions” for a mistrial once the District Court made it clear that it was granting a mistrial sua sponte, Opinion, ¶ 36. This, the Court states, is “the critical factor” in the Court’s disposition of this matter. Opinion, ¶ 39. Yet, during the in-chambers conference, the trial judge expressed the view that Cates had not presented proper grounds for a mistrial and, thus, that he would not grant a mistrial on the grounds argued by Cates. Cates’ motions, therefore, were no longer “on the table.” Indeed, at the hearing on Cates’ motion to dismiss, the District Court observed that “there wasn’t some sort of mistrial motion by the defense hanging out there that I granted.... I think that if-if anything, it was the Court that basically declared a mistrial based on what was before it, not because of the defense issues regarding testimony that morning or other things.” In other words, there were no lingering defense motions to be “withdrawn.”
¶47 So, just prior to the court’s sua sponte decision to terminate the trial, Cates stood in the following posture. He had preserved for appeal the issue of whether K.K.’s allegedly improper testimony required a mistrial. He now could proceed with the trial-one to which the State had come ill-prepared and in which the prosecution (in Cates’ view) had made misrepresentations to the jury during its opening statement. He could put the State to its proof, knowing there were serious defects in the prosecution’s case. He could hold the State accountable should it fail to fulfill the promises it had made to the jury. And he could use to his benefit the State’s failure to secure critical forensic evidence. Or, alternatively, he could consent to a mistrial on the court’s own motion, forgo taking advantage of the defects in the State’s case, and thereby subject himself to reprosecution in a second trial (at which time the State, presumably, would not rely on his alleged confession but instead *55 would be prepared to offer the forensic evidence).
¶48 Nothing in the record indicates, let alone affirmatively establishes, that Cates selected the latter option. Indeed, the suggestion that he consented to the termination of his trial by the court sua sponte with the result that the State could reprosecute him after having buttressed its evidence and repaired the defects in its case is utterly absurd. This Court essentially attributes irrational decision-making to Cates and his attorneys.
¶49 It is important to recall that the right under Article II, Section 25 not to “be again put in jeopardy for the same offense previously tried in any jurisdiction” is a fundamental right. See State v. Tapson, 2001 MT 292, ¶ 15, 307 Mont. 428, 41 P.3d 305. Moreover, it is well-settled that courts “should not presume acquiescence in the loss of fundamental rights.” Barker v. Wingo, 407 U.S. 514, 525-26, 92 S. Ct. 2182, 2189 (1972) (internal quotation marks omitted); see also Tapson, ¶ 25 (“This Court will not engage in presumptions of waiver [of one’s constitutional rights].”); State v. Walker, 2007 MT 34, ¶ 14, 336 Mont. 56, 153 P.3d 614 (“We refuse to presume that a defendant waived a constitutional right.”). Waiver is “the voluntary abandonment of a known right.” State v. McCarthy, 2004 MT 312, ¶ 32, 324 Mont. 1, 101 P.3d 288. Accordingly, before a defendant can waive a fundamental right, such waiver, to be recognized by the courts, must be informed and intelligent, for there can be no waiver by one who does not know his rights or what he is waiving. McCarthy, ¶ 32; Tapson, ¶ 26.
¶50 In this connection, I agree with Justice Leaphart that, given the fundamental nature of the right not to “be again put in jeopardy for the same offense previously tried,” a defendant should not be deemed to have waived the right to object to the termination of his trial absent a specific, on-the-record waiver by the defendant himself. Dissent, ¶ 64. Indeed, it is well-established in our right-of-presence cases that “if a defendant chooses to waive his right to be present at a critical stage of the trial, the trial court must obtain an on-the-record personal waiver by the defendant acknowledging that the defendant voluntarily, intelligently, and knowingly waives that right.” State v. Matt, 2008 MT 444, ¶ 24, 347 Mont. 530, 199 P.3d 244 (citing McCarthy, ¶ 32, Tapson, ¶ 28, State v. Bird, 2002 MT 2, ¶ 38, 308 Mont. 75, 43 P.3d 266, State v. Roedel, 2007 MT 291, ¶ 59, 339 Mont. 489, 171 P.3d 694, and State v. Aceto, 2004 MT 247, ¶¶ 45-46, 323 Mont. 24, 100 P.3d 629). The right not to be subjected to double jeopardy is no less compelling or fundamental than the right to be present at a critical stage of the trial. Thus, this standard for obtaining *56 a waiver should apply with equal force in the double jeopardy context. Here, Cates never made an on-the-record personal waiver of his right not to be again put in jeopardy for the same offense previously tried. Accordingly, he cannot be deemed to have waived that right.
¶51 The Court acknowledges these concerns are “valid.” Opinion, ¶ 39. Yet, despite the complete absence of an on-the-record personal waiver by Cates, the Court divines that he in fact waived his constitutional right against reprosecution by way of his attorneys’ nebulous comments and their supposed “affirmative conduct.” With one exception, however, all of the conduct the Court recites is anything but “affirmative.” The Court states that Cates’ counsel did not withdraw their previous motions. Opinion, ¶ 36. However, as explained above, there were no previous motions to withdraw; and regardless, failing to withdraw previous motions is not “affirmative” conduct. The Court also states that Cates did not voice an objection to the mistrial. Opinion, ¶ 36. But, again, failing to act is not “affirmative” conduct. Cf. State v. Fenton, 506 P.2d 665, 667 (Ariz. App. 2d Dist. 1973) (“[M]ere silence or failure to object to the jury’s discharge is not such consent as will constitute waiver of a former jeopardy plea.”); Carrillo v. Superior Court, 52 Cal. Rptr. 3d 614, 623 (Cal. App. 2d Dist. 2006) (“A defendant is under no duty to object in order to claim the protection against double jeopardy and his silence in the face of an ensuing discharge cannot be deemed a waiver.”). The Court points out that Oaas “affirmatively offered” that he had nothing to say. Opinion, ¶ 36. However, I fail to understand how “affirmatively offering” nothing to say constitutes “affirmative conduct” amounting to a waiver. As noted by the Court in ¶ 34, the notions of “tacit consent” and “constructive consent” have been rightly criticized. The Court also points out that Beck thanked the prosecutors for coming forward. Opinion, ¶ 36. First, I cannot accept the proposition that civility to opposing counsel constitutes a waiver. Second, Beck’s comments do not show that Cates made an informed and intelligent decision to waive a constitutional right.
¶52 Lastly, the Court places great emphasis on the fact that Cates’ counsel put forth two separate mistrial motions before the District Court declared a mistrial. Opinion, ¶ 36. Although these motions do not constitute on-the-record personal waivers by Cates himself, the Court states that this conduct demonstrates that he was “clearly willing to give up his ‘valued right to have his trial completed by [the] particular tribunal’ which was sworn and impaneled in this case.” Opinion, ¶ 36 (brackets in Opinion). Yet, even if he was willing to do *57 so at the outset of the colloquy with the District Court, this does not mean he was willing to do so for reasons he neither requested nor wanted. Moreover, circumstances changed during the course of the colloquy, and the Court fails to acknowledge all of the considerations at play for Cates during this period.
¶53 Cates had decided not to file a motion to suppress his statements obtained in violation of McKee, electing instead to use the interrogation videotape for his defense. He did, however, decide to raise the issue of whether K.K.’s allegedly improper testimony necessitated a mistrial. Certainly, his decision to do so was a calculated risk. On one hand, the court might grant his motion, in which case he could be retried. But on the other hand, the court might deny his motion, in which case he would have preserved an issue for appeal and could resume his efforts to obtain an acquittal. This latter outcome reflects the position in which Cates stood just prior to the District Court’s sua sponte termination of the trial. It is utterly implausible that in making his mistrial motions, Cates accepted the risk that the court would deny those motions (leaving him with a legitimate issue for appeal) but then, sua sponte, terminate the trial because the prosecution, entirely of its own accord, had created what the court believed was a “trial-time bomb”-a circumstance which, again, Cates intended to use to his advantage.
¶54 “The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of [prejudicial judicial or prosecutorial] error.” United States v. Dinitz, 424 U.S. 600, 609, 96 S. Ct. 1075, 1080 (1976). The considerations which bear on the decision to proceed with the trial or begin the process anew “are peculiarly within the knowledge of the defendant, not the judge, and the latter must avoid depriving the defendant of his constitutionally protected freedom of choice in the name of a paternalistic concern for his welfare.” Carrillo, 52 Cal. Rptr. 3d at 623 (internal quotation marks omitted). Here, the District Court, after explicitly refusing to grant a mistrial on the grounds argued by defense counsel, took matters into its own hands and terminated Cates’ trial on grounds he neither requested nor wanted. Cates did not consent to this action,[1] and he did not waive his right to object to it.
*58 ¶55 The Court suggests that when a defendant indicates he is giving up his right to have his trial proceed before the first jury, it is a renunciation of that right for all purposes, unless and until he indicates to the court that he is “now changing course and wants to have the original tribunal determine his guilt.” See Opinion, ¶¶ 39-40 (citing United States v. Razmilovic, 507 F.3d 130 (2d Cir. 2007)). As Justice Leaphart explains below, however, a defendant who makes a motion for a mistrial retains the right to control the course to be followed with respect to other errors in the trial. Dissent, ¶¶ 68-69; see also Dinitz, 424 U.S. at 609, 96 S. Ct. at 1080. Moreover, the Court cites no authority for the proposition that a defendant’s mistrial motion constitutes a waiver for all purposes which must be affirmatively rescinded lest the trial court thereafter abort the trial, sua sponte, on any ground of its choosing.
¶56 Razmilovic is readily distinguishable on its facts and does not support the Court’s new rule. It is noteworthy, nonetheless, that the Razmilovic court held that retrial was barred because the defendant did not “deliberately forego[ ]” his right to have his guilt determined by his original tribunal, Razmilovic, 507 F.3d at 142, a showing that certainly does not appear on the record with respect to Cates. In any event, I cannot agree with the notion that after the District Court conveyed its unwillingness to grant defense counsel’s motions for a mistrial, Cates was then required to inform the court that he was “changing course” so as to preclude the court from deciding, sua sponte, to terminate his trial on grounds he neither requested nor wanted.
¶57 As a final matter, I note that the District Court’s action is not sustainable under the “manifest necessity” doctrine either. Under that standard, “a trial can be discontinued when particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice.” State v. Carney, 219 Mont. 412, 417, 714 P.2d 532, 535 (1986) (internal quotation marks omitted). This standard contemplates that “ ‘there are degrees of necessity and we require a “high degree” before concluding that a mistrial is appropriate.’ ” Carney, 219 Mont. at 417, 714 P.2d at 535 (quoting Arizona v. Washington, 434 U.S. 497, 506, 98 S. Ct. 824, 831 (1978)). As the Supreme Court explained in Washington:
The question whether that “high degree” has been reached is answered more easily in some kinds of cases than in others. At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence. Although there *59 was a time when English judges served the Stuart monarchs by-exercising a power to discharge a jury whenever it appeared that the Crown’s evidence would be insufficient to convict, the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn this “abhorrent” practice. . . .
Thus, the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused.
At the other extreme is the mistrial premised upon the trial judge’s belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial.
Washington, 434 U.S. at 507-09, 98 S. Ct. at 831-32 (footnotes omitted). Since a mistrial declared without the defendant’s request or consent implicates his “valued right to have his trial completed by a particular tribunal,” Dinitz, 424 U.S. at 606, 96 S. Ct. at 1079 (internal quotation marks omitted), a court “must exercise the power to discharge a jury with the greatest caution, under urgent circumstances, and for plain and obvious cases,” Carney, 219 Mont. at 418, 714 P.2d at 535 (internal quotation marks omitted).
¶58 Here, the State told the jury in its opening statement about evidence which the State’s own “expert” (Sipe) concluded was inadmissible. Prior to this, the State failed to secure forensic evidence which it needed to prove its case. In short, the State came to trial unprepared. Yet, the State now seeks to subject Cates to a second trial not because of any errors caused by or complained of by Cates in the first trial, but because the prosecution figured out on the third day of trial, based on an 11-month-old case, that it had committed what it believed to be “reversible error.”
¶59 I cannot agree with the State that the prosecutors, in arguing for a mistrial (or declining to object to one) were not “maneuvering” to achieve a second, better opportunity to convict Cates. That is exactly what they were trying to do, having figured out, belatedly, that they could not use the supposed “confession” they had intended to use in proving their case. As a matter of fact, the District Court explicitly found that both sides were “maneuvering like crazy” and that each party “wanted the mistrial onus to be on the other, and both wanted the onus on the other for tactical reasons, double jeopardy being the quickly obvious one.”
*60 ¶60 The strictest scrutiny is appropriate when a mistrial is based on the unavailability of critical prosecution evidence. Carney, 219 Mont. at 417, 714 P.2d at 535; Washington, 434 U.S. at 508, 98 S. Ct. at 832. If Cates is to retain primary control over the course to be followed under these circumstances, then the State cannot unilaterally obtain a mistrial due to its own error in presenting its case. No manifest necessity existed for the District Court’s sua sponte termination of Cates’ trial. Rather, the court, on its own motion, gave the State a second bite of the apple because the prosecution had created a “trial-time bomb” by coming to trial unprepared to try its case.
¶61 For the foregoing reasons, and based on the record before us, I would hold that Cates did not consent to, or waive his right to object to, the termination of his trial. Nor was there a manifest necessity for terminating it. I would reverse the District Court’s Order on Motion to Dismiss/Double Jeopardy and remand this case with instructions to grant Cates’ motion to dismiss.
¶62 I dissent.

 Indeed, in denying Cates’ posttrial motion to dismiss on double jeopardy grounds, the District Court observed that “there was no defense consent for the mistrial actually declares”.