FILED

10/31/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 17-0084

OP 17-0084

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 261

CITY OF BILLINGS, ex rel.,
JAMES JOSEPH HUERTAS,

      Relator and Petitioner,

   v.

BILLINGS MUNICIPAL COURT, The Honorable
Sheila R. Kolar, and

THIRTEENTH JUDICIAL DISTRICT COURT,
the Honorable Michael G. Moses,

      Respondents.

ORIGINAL PROCEEDING:    Billings Municipal Court,
                                 In and For the City of Billings, Cause No.
                                 TK-2016-4035
                                 Honorable Sheila R. Kolar, Presiding Judge

COUNSEL OF RECORD:

      For Petitioner:

          Lisa J. Bazant, Attorney at Law, Billings, Montana

      For Respondents:

          Brent Brooks, Billings City Attorney, Benjamin J. Halverson,
          Deputy Billings City Attorney, Billings, Montana

                        Submitted on Briefs:  August 23, 2017
                                  Decided:  October 31, 2017

Filed:

                                              _____
                                                    Clerk

**OPINION AND ORDER**

Justice Laurie McKinnon delivered the Opinion and Order of the Court.

¶1 Petitioner James Joseph Huertas (Huertas) requests this Court exercise supervisory control over the Billings Municipal Court and conclude the Municipal Court placed Huertas in double jeopardy when it granted the City's motion for a mistrial and subsequently scheduled a new trial.

¶2 Montana Constitution, Article VII, Section 2(2), grants this Court general supervisory control over all other courts. This Court exercises supervisory control on a case-by-case basis, as it is an extreme remedy. M. R. App. P. 14(3). Supervisory control is appropriate "when urgency or emergency factors exist making the normal appeal process inadequate, when the case involves purely legal questions, and when one or more of" three enumerated circumstances exist. M. R. App. P. 14(3). We accepted supervisory control over this matter on March 22, 2017, concluding the double jeopardy issue was appropriate for supervisory control pursuant to *Keating v. Sherlock*, 278 Mont. 218, 924 P.2d 1297 (1996).

¶3 We reverse the Municipal Court's order denying Huertas's motion to dismiss and address the following issue:

> *Did the Municipal Court abuse its discretion in declaring a mistrial and err in concluding that double jeopardy did not bar Huertas's retrial?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶4 The City of Billings (City) charged Huertas with Partner or Family Member Assault (PFMA) following an incident between Huertas and alleged victim L.H. The

2

Municipal Court set Huertas's trial for January 20, 2017, at which time a jury was impaneled and sworn. During its case-in-chief, the City called L.H. to the stand. The City asked L.H. if she wanted to be there and she replied that she did not. When asked, "Are you only here because of a court-ordered subpoena?" she responded, "I am," and indicated that she was unhappy testifying. The City did not inquire further into the subpoena and proceeded with its direct examination.

¶5 After the City completed its questioning of L.H., defense counsel Lisa Bazant (Bazant) began cross-examining L.H. During cross-examination, the following exchange occurred:

[Bazant]: Did members of the Billings Police Department try to get you to testify a particular way? . . . Were you visited by the Billings Police Officer yesterday?

[L.H.]: Yes.

[Bazant]: And did that officer attempt to influence your testimony today?

[L.H.]: Yes.

[Bazant]: Influence you in a way that it would be more toward the prosecution's—

[City]: I'd like to object. May we approach?

The Judge allowed counsel to approach, and after an inaudible conversation excused the jury but asked the parties to remain. The jury left the courtroom and L.H., still under oath, explained the interaction at issue. L.H. testified that the night before trial, at approximately 11:00 p.m., Billings Police Officer LaMantia (Officer LaMantia) served her a subpoena requiring her to appear at the trial as one of the City's witnesses. L.H.

3

said her roommate let Officer LaMantia into their home and Officer LaMantia sat next to L.H. on the couch.

¶6      Before L.H. explained more, the Judge asked the City if it knew about the interaction.  The City said the information was a "surprise" that had a "significant impact" on its case and relayed two main concerns.  First, if what L.H. alleged was true, Officer LaMantia engaged in witness tampering and he needed the opportunity to respond to L.H.'s allegations.  Second, if the allegations were true, the City needed to declare a mistrial because the City was unfairly prejudiced by the information.  If the trial moved forward after the jury heard L.H.'s testimony, the City needed to investigate Officer LaMantia's actions and contemplated that it may have to dismiss the case.  On the other hand, the City observed that if the case moved forward and Huertas was acquitted, it would then be "too late" to address the allegations.  The City concluded it was unable to proceed with the new, very significant, information because it needed to interview Officer LaMantia and L.H.

¶7      Bazant agreed that the information had a significant impact on the case and expressed concern that L.H., the City's own witness, may have been inappropriately influenced by an officer.  The Judge responded that she was "not going to put the City Prosecutor" in an unfavorable light because "[h]e didn't know."  During this discussion both Bazant and the Judge alluded to the fact that there was a preexisting relationship between Officer LaMantia and Huertas.  While we cannot ascertain the exact nature of their relationship from our review of the record, it is clear that Huertas, Officer LaMantia, and L.H. were personally familiar with one another at the time the subpoena was served.

4

The Judge expressed serious concern about the events, stating that if Officer LaMantia behaved as alleged "the City is put at disadvantage unbeknownst to them." The City reported it had asked a sergeant to serve the subpoena and did not know Officer LaMantia was going to serve it.

¶8     The Judge then asked L.H. to explain more about what happened the night before. L.H. testified that Officer LaMantia and another officer served her the subpoena in the presence of her roommate. L.H. said that, after giving her the document, Officer LaMantia wanted to give her "friendly advice as a friend." L.H. testified that Officer LaMantia told L.H. she needed to be at trial so Huertas would be "punished for everything that he has done." The Judge responded, "[B]ut he didn't tell you to testify. He just said you needed to be there. It's a Subpoena. You are under Subpoena so he did do that." L.H. responded, stating that Officer LaMantia told her to "ignore the uniform" and that he, "as a friend," was telling her she needed to be at trial to "tell them exactly what happened." Based on these allegations, the following exchange occurred between L.H., Bazant, and the Judge:

| [Judge]: | [I]t is a Subpoena, and you are subpoenaed, and you do need to be here because you were subpoenaed, and as a friend or whatever he says. Is that all he said to you? |
|---|---|
| [L.H.]: | Honestly, I was a mess. I don't— |
| [Judge]: | Is that all he said to you? |
| [Bazant]: | Did he encourage you to testify one way or the other? |
| [Judge]: | No. |
| [L.H.]: | Yes, he enc—he did though. |

| [Judge]: | You just told me, stated to me that he just said you need to be there and tell the truth. Did he not say— |
|---|---|
| [L.H.]: | But in a negative light. |
| [Judge]: | And what do you mean a negative light? |
| [L.H.]: | In that he wanted to see [Huertas] punished even though, he, I told him that— |
| [Judge]: | He wanted to see [Huertas] punished. Okay. So that's a personal vendetta or something. |
| [L.H.]: | Yes. |
| [Judge]: | I don't know, between the two. But he said he wanted to see him punished. But did he tell you how to testify. |
| [L.H.]: | No, I guess not. |

¶9     The Judge stated that the interaction did not go "far enough" for her; that Officer LaMantia was simply serving a subpoena. She asked the City if it thought there was an issue, and the City started to discuss the other people present during the interaction and indicated there may be police body camera recordings of the interaction. The Judge interrupted the City, stating, "Well, she hasn't indicated that he influenced her how to testify. He served a subpoena . . . . But what she testified earlier that he influenced her testimony or whatnot, the jury's already heard it. And honestly that's not what she's saying to me right now."

¶10    The Judge observed an inconsistency between L.H.'s testimony in front of the jury, where she said she was influenced by an officer, and L.H.'s testimony outside the presence of the jury, where she said differently. The fact that the jury heard potentially

6

inaccurate information concerned the Judge. The City began a conversation about how the situation should proceed, moving for a mistrial in the process:

[City]: So what I would suggest to deal with this situation moving forward is that [L.H.] be given the opportunity to be contacted by a detective to get a statement regarding her conversation with Officer [LaMantia] that—

[Judge]: And they should pull this record and listen to what she had to say today, too, as well.

[City]: And they should pull this, and they need to get all the [body camera footage], and *I'm asking for a mistrial* because there is no way that I would've had knowledge about that that until just—

[Judge]: Well, and it's not even fit knowledge is this what she says to me right now, and what was said on the record is a huge disadvantage and a conflict, and I don't think it can be remedied. I really don't.

(Emphasis added).

¶11     The Judge asked the defense for its position regarding the City's request for a mistrial, and Bazant responded:

Well, I do hate to go forward but, or I mean to hate to go forward in such a manner that we're going to do, cause some problems later. Listening to what [L.H.] is saying now versus what I had thought was her testimony earlier, it was more than just, you know, a vendetta with Huertas and [Officer LaMantia]. It was, it was more, [L.H.], you need to testify this way so he does get (inaudible).

The Judge answered, contemplating the testimony's impact on the jury and suggesting she was inclined to declare a mistrial:

Right, and that was your impression. When you were going to cross examine her or, or, and honestly that's how she testified on the record, and then the jurors already been poisoned, and I think it is a mistrial. I don't think there's any way we can remedy that, I really don't. And, and I am going to tell you that you will, if we do this mistrial, we're going to have to have a date certain again . . . .

7

The City pointed out that it needed to investigate the circumstances surrounding the subpoena's service, but the Judge had already decided L.H. was not improperly influenced by Officer LaMantia:

> Well, you know, I still believe we could go on even though this may have happened. What she testified to, I don't think it needs to come up, and that's up to you guys, and that will delay the trial longer if you guys want to get into it. I don't believe what she stated on the record goes that far. He should've never served it. He may have an issue with the Defendant, but I don't believe with what she just stated that he told her that you, it's pretty much you need to testify he needs to be punished, not you need to testify . . . don't say the truth or whatever. So that isn't what I got from this, but it still poisoned our jury, and we were moving along quite nicely. We're going to have to set a date certain. . . . This needs to go forward.

Bazant agreed that more investigation needed to occur, but did not say anything about the mistrial:

> Well, I think it does need to go forward, and I think we do need to hear from [L.H.'s roommate] and, you know, listen to the [body cameras]. Because I think if she was feeling threatened, whether or not he was as, you know, it would be really stupid for an officer to say you need to testify (inaudible).

The Judge responded to Bazant and definitively declared a mistrial:

> Yeah, but the point is is she's supposed to be here today, and it sounds like she's not having any problem holding her own. Okay? And she's going to testify to what she believes the truth is. And if that's an issue that happened, that's between the City of Billings Police Department if it gets investigated. It doesn't need to come back into this courtroom. I can tell you that because I don't think that she's having any problem with what she wants to testify. I don't believe she was influenced by him. She's here today. She was influenced, but she was subpoenaed, she has to be here. . . . It's a mistrial, and what is our new [trial] date? . . .

¶12 The parties started to talk about a new trial date and witness availability. The Judge stated the City may need time to investigate the subpoena situation, but she still did

not believe that the "information will be relevant for the trial." She asked the parties if they agreed to that, and Bazant again emphasized further investigation, responding, "I want to see what's on [the body camera]. I want to hear how it came down. I mean as I said—" The Judge interrupted Bazant, stating:

> Well, and even if it, if he even did influence her how to testify or not to testify, I don't believe at this point she was influenced by anything. And when the trial day comes, I don't believe that, I think again it's between the City and their officer, and investigation, internal investigation if that's what happened.

The City reminded the Judge that witness tampering does not have to be successful in order for it to be a crime, but the Judge re-emphasized that, even if Officer LaMantia was prosecuted, the incident would not have "any bearing on this case because I do not believe that [L.H.] was influenced by it." The Judge then inquired as to the best dates for a retrial and ultimately rescheduled Huertas's trial for February 14, 2017.

¶13 On February 6, 2017, Huertas filed a motion in Municipal Court to dismiss the PFMA charge, contending further prosecution would violate his constitutional rights which protect him from being twice placed in jeopardy for the same offense. He argued the City moved for a mistrial because it knew it was unlikely to secure a conviction following L.H.'s testimony. Huertas emphasized that his right to have his case decided by that particular tribunal, a right "at the core of the constitutional protection to be free from double jeopardy," would be violated if he was retried. One day later, on February 7, 2017, the Municipal Court issued a one-page order, summarily denying Huertas's motion to dismiss without addressing his legal arguments. Following the denial, Huertas petitioned the District Court for a Writ of Mandamus or Other Appellate Relief, asking

9

the District Court to vacate the Municipal Court's denial and grant his motion to dismiss.

The District Court denied the petition, holding the case was not appropriate for its review because Huertas had a "plain, speedy, and adequate remedy in the ordinary course of law" as provided in § 27-26-102(2), MCA. The District Court observed Huertas adequately preserved his constitutional objections which could be raised on appeal if necessary after the Municipal Court entered final judgment.[1] Huertas then filed a petition for Writ of Supervisory Control, asking this Court to direct the Municipal Court to dismiss the criminal proceeding against him on double jeopardy grounds. The Municipal Court temporarily vacated Huertas's retrial and the case is now pending our decision.

## STANDARD OF REVIEW

¶14 This Court reviews a trial court's declaration of a mistrial for an abuse of discretion. *State v. Cates*, 2009 MT 94, ¶ 21, 350 Mont. 38, 204 P.3d 1224 (citing *State v. Flores*, 1998 MT 328, ¶ 12, 292 Mont. 255, 974 P.2d 124). We will affirm a trial

---

[1] With respect to the District Court's conclusion that Huertas had an adequate remedy of appeal, we reiterate our statements made in *Keating*, 278 Mont. at 224, 924 P.2d at 1300, which was also the basis for our decision to accept supervisory control in the instant proceeding:

> Both the U.S. Constitution, Fifth Amendment and the Montana Constitution, Article II, Section 25, protect individuals from being twice placed in jeopardy. If those guarantees are to have any significance, they require that the prohibition must be given effect prior to, not after, the second trial. If, as the State argued, Keating proceeded with a second trial and were convicted, he could appeal on the basis of double jeopardy. This Court could vacate the conviction. However, vacating the conviction would not change the fact that Keating would have been "put in jeopardy." The same would hold true even if Keating were acquitted in the second trial. That is, the acquittal would not alter the fact that, in being tried a second time, he was again placed in jeopardy of being convicted. The constitutional prohibition is designed to prevent the individual from being put at risk of conviction at a second trial. Once he endures the second trial, regardless of conviction or acquittal, he has incurred the risk; he has been put in "jeopardy," and that fact cannot be remedied or expunged after the fact.

judge's decision if he or she acted rationally and responsibly in declaring a mistrial. *Cates*, ¶ 21 (citing *Flores*, ¶ 12).

¶15 A trial court's denial of a defendant's motion to dismiss criminal charges on double jeopardy grounds is a question of law that we review for correctness. *State v. Stone*, 2017 MT 189, ¶ 10, 388 Mont. 239, 400 P.3d 692 (citing *Cates*, ¶ 22; *State v. Maki*, 2008 MT 379, ¶ 9, 347 Mont. 24, 196 P.3d 1281).

## DISCUSSION

¶16 *Did the Municipal Court abuse its discretion in declaring a mistrial and err in concluding that double jeopardy did not bar Huertas's retrial?*

¶17 The Fifth Amendment of the United States Constitution, applicable to the states via the Fourteenth Amendment, and Article II, Section 25, of the Montana Constitution protect citizens from being placed twice in jeopardy for the same offense. U.S. Const. amend. V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy . . . ."); Mont. Const. art. II, § 25 ("No person shall be again put in jeopardy for the same offense previously tried in any jurisdiction."). These constitutional safeguards are important because the prosecution, "with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense . . . ." *Cates*, ¶ 30 (quoting *United States v. Dinitz*, 424 U.S. 600, 606, 96 S. Ct. 1075, 1079 (1976)) (internal quotations and citations omitted). Accordingly, these provisions seek to provide finality for a criminal defendant. *State v. Carney*, 219 Mont. 412, 416, 714 P.2d 532, 534 (1986) (quoting *United States v. Jorn*, 400 U.S. 470, 479, 91 S. Ct. 547, 554 (1971)).

11

¶18 During a jury trial, jeopardy attaches as soon as the jury is impaneled and sworn. *Cates*, ¶ 30 (citing *Carney*, 219 Mont. at 417, 714 P.2d at 535). When a mistrial is declared after jeopardy attaches, "the defendant's valued right to have his trial completed by a particular tribunal is also implicated." *Cates*, ¶ 31 (citing *Dinitz*, 424 U.S. at 606, 96 S. Ct. at 1079) (internal quotations and citations omitted). In this case, jeopardy undisputedly attached when the jury was impaneled and sworn at the start of trial on January 20, 2017. Thus, Huertas's right to be free from double jeopardy is clearly implicated. The question now before the Court is whether retrying Huertas for the PFMA charge would violate his federal and state constitutional rights to be free from double jeopardy.

¶19 After a defendant's double jeopardy rights are implicated and a mistrial is declared, a "second criminal trial is barred unless there was a manifest necessity to terminate the trial or the defendant acquiesced in the termination." *Cates*, ¶ 33 (quoting *Carney*, 219 Mont. at 417, 714 P.2d at 535) (internal omissions, quotations, and citations omitted). Manifest necessity to discontinue a trial exists when "particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice." *Cates*, ¶ 33 (quoting *Carney*, 219 Mont. at 417, 714 P.2d at 535; *Wade v. Hunter*, 336 U.S. 684, 690, 69 S. Ct. 834, 838 (1949)). A mistrial is an "exceptional remedy," *State v. Miner*, 2012 MT 20, ¶ 13, 364 Mont. 1, 271 P.3d 56 (quoting *State v. Novak*, 2005 MT 294, ¶ 26, 329 Mont. 309, 124 P.3d 182), and therefore a "remedial action short of a mistrial is preferred unless the ends of justice require otherwise."

*Novak*, ¶ 26.  Where there are only "technical errors or defects that do not affect the substantial rights of the defendant" a mistrial is inappropriate.  *Miner*, ¶ 13.

¶20   In *Carney* we recognized that the key word "necessity" cannot be interpreted literally when analyzing a claim of double jeopardy.  *Carney*, 219 Mont. at 417, 714 P.2d at 535 (adopting the United States Supreme Court's manifest necessity explanations from *Wade*, 336 U.S. at 690, 69 S. Ct. at 838, and *Arizona v. Washington,* 434 U.S. 497, 506-09, 98 S. Ct. 824, 831-32 (1978)).  Instead of a literal interpretation, we observe necessity in terms of degree, and sufficient manifest necessity in the double jeopardy context requires a high degree of necessity.  *Carney*, 219 Mont. at 417, 714 P.2d at 535.  To determine what degree of necessity exists in a given case we must undertake an individualized and fact-intensive inquiry:

> The question whether that "high degree" has been reached is answered more easily in some kinds of cases than in others.  At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence.  Although there was a time when English judges served the Stuart monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict, the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn this "abhorrent" practice . . .
>
> Thus, the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused.
>
> At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial. . . .

*Carney*, 219 Mont. at 417, 714 P.2d at 535 (quoting *Arizona*, 434 U.S. at 506-09, 98 S. Ct. at 831-32) (omissions in *Carney*).  Furthermore, a "more stringent manifest necessity

standard applies when a trial court considers declaring a mistrial without the defendant's request or consent." *State v. Partin*, 287 Mont. 12, 16, 951 P.2d 1002, 1004 (1997).

¶21    With these considerations in mind, we now address whether there was manifest necessity to discontinue Huertas's trial.  At the time the Municipal Court declared a mistrial, L.H. had only made two potentially damaging statements in the presence of the jury.  She answered "yes" to the question of whether she was visited by an officer and "yes" to the question of whether the officer attempted to influence her testimony. Immediately, the City objected and asked to approach the bench before L.H. could answer Bazant's third question.  At this stage of the proceeding, the City still could have rehabilitated L.H. through redirect examination.  This is especially true in light of the knowledge the City acquired through the subsequent inquiry made by the court and parties regarding the incident.  The Judge questioned L.H. outside of the presence of the jury to clarify the circumstances surrounding the subpoena's service and was convinced that L.H. was not improperly influenced by Officer LaMantia.  Significantly, L.H.'s responses to the questions were sufficient enough to demonstrate to the Judge that nothing inappropriate occurred when the subpoena was served—similar questioning could have occurred in front of the jury to demonstrate the same.  Instead, the Judge believed L.H.'s testimony could not be remedied because the jury was already "poisoned," an opinion she reiterated throughout the questioning and subsequent conversation.  The Judge also emphasized that L.H.'s testimony put the City at a "huge disadvantage" and, in her opinion, presented a significant conflict that could not be remedied.  The Judge's statements that the City did not know about the circumstances of

14

the subpoena's service, that the City was disadvantaged by the testimony, that a conflict now existed, and that the jury was "poisoned" do not demonstrate manifest necessity to terminate the proceeding, particularly when remedial measures were available.

¶22 Furthermore, we must note that L.H. was the City's witness. The City was ultimately responsible for serving its own witness, albeit a hostile one, with a subpoena to ensure her presence at trial. The fact that the witness testified to the circumstances of the service in an unexpected light does not create manifest necessity sufficient to justify a new trial. We have no reason to believe the City used the service to improperly achieve some sort of tactical advantage, but the City's simple lack of knowledge that the subpoena was served as alleged by L.H. is not persuasive—the City could have easily discovered information regarding the service, as the City's own police officer served the subpoena on the City's own witness. The Judge articulated no conditions that enable us to conclude manifest necessity obliged the trial's termination; nor do we find support for such a determination from our review of the record. We therefore conclude the Municipal Court abused its discretion in declaring a mistrial because there was no manifest necessity.

¶23 Even though no manifest necessity exists in this case, Huertas may still be retried if he acquiesced in the trial's termination. A defendant acquiesces in a trial's termination "if the totality of the circumstances and the affirmative conduct of the defendant show that she waived her right to object to the termination of trial proceedings." *Cates*, ¶ 35. This Court rejected in *Cates* the notion that acquiescence or "implied consent" could be "inferred from a defendant's 'statements or silences' or a failure to object to the

15

termination." *Cates*, ¶ 34 (quoting *Keating*, 278 Mont. at 227-29, 924 P.2d at 1302-03). Instead, this Court held that a retrial is not barred when the defendant's affirmative conduct, combined with the totality of the circumstances, demonstrates a waiver of the right to object to the termination of trial proceedings. *Cates*, ¶ 35. Our focus was on the totality of the circumstances surrounding the termination of the proceedings and whether the defendant's *affirmative* conduct demonstrated a waiver of the right against retrial. In *Cates*, this Court rejected the approach that a waiver could be implied only from a defendant's "silence or passive assent." *Cates*, ¶¶ 35, 36.

¶24    In *Cates*, we held Cates could be retried because he affirmatively waived his right to object to the trial's termination. *Cates*, ¶ 36. Our decision was based on the totality of the circumstances, but of primary significance was the fact that Cates moved for a mistrial on two separate grounds before the district court declared a mistrial *sua sponte* following the prosecution's motion for a mistrial. *Cates*, ¶¶ 9-11, 36, 39-40. We decided that Cates's mistrial motions "demonstrated that he was clearly willing to give up his valued right to have his trial completed by the particular tribunal which was sworn and impaneled . . . which right is at the core of the constitutional protection to be free from double jeopardy." *Cates*, ¶ 36 (citing *Dinitz*, 424 U.S. at 606, 96 S. Ct. at 1079) (internal quotations omitted). Cates had the opportunity, after the district court declared a mistrial, to be heard and object, but he did not withdraw his previous motions for a mistrial or otherwise object. *Cates*, ¶ 36. Instead, one of Cates's attorneys "affirmatively offered that he had nothing to say" and the other "thanked the prosecution team for coming forward." *Cates*, ¶ 36. We decided those circumstances amounted to more than "mere

16

silence or passive assent" and were sufficient to demonstrate an affirmative waiver of Cates's right to object to the termination of the proceedings. *Cates*, ¶ 36.

¶25 Considering the totality of the circumstances in this case and evaluating any affirmative conduct by Huertas, we conclude a waiver of Huertas's right to object to the termination of the proceedings has not been demonstrated. The specifics of this case are notably different than those of *Cates*. Unlike in *Cates*, where the defendant requested a mistrial on two separate grounds prior to the court's ruling, here Huertas never requested a mistrial. Thus, Huertas did not demonstrate a willingness to give up his right to have his trial completed by a particular tribunal the way Cates did. Additionally, in *Cates* we found it important that Cates had the opportunity, after the court declared a mistrial, to be heard and object. The same opportunity to be heard was not present in this case, as Bazant was interrupted several times when she tried to state Huertas's position regarding the mistrial. As Bazant attempted, multiple times, to emphasize that an investigation into the events of the subpoena's service needed to occur, the Judge simply highlighted the fact that she had already decided that those circumstances had no bearing on the PFMA trial.

¶26 Furthermore, none of Huertas's actions or the statements of his attorney can be construed as affirmative conduct waiving his right to object to the termination of the proceedings. Bazant's comments such as, "I do hate to go forward . . . in such a manner that we're going to . . . cause some problems later;" "I think it does need to go forward" for more investigation; and "I want to see what's on [the body camera]" do not amount to affirmative conduct evidencing a waiver by Huertas of his right to object to the

17

termination of the proceedings. The City and Bazant were both focused on investigating the circumstances of the subpoena's service, while the Judge had already decided nothing improper occurred and moved on to declaring a mistrial before the parties were able to precisely state their positions or properly object.

¶27 Where Huertas did not request a mistrial, made no affirmative statements waiving his right to object to the termination of the proceedings, and was frustrated in his opportunity to be heard, we cannot conclude that a waiver has been demonstrated. Therefore, retrying him for the PFMA charge would violate his right to be free from double jeopardy.

## CONCLUSION

¶28 Retrying Huertas for the PFMA charge would violate his federal and state fundamental constitutional rights to be free from double jeopardy. There was no manifest necessity to discontinue the trial and Huertas's conduct did not demonstrate a waiver of his right to object to termination of the proceedings and to a retrial. The Municipal Court's denial of Huertas's motion to dismiss the PFMA charge is reversed and the case is dismissed with prejudice. Accordingly,

IT IS ORDERED that the Municipal Court's February 7, 2017, Order Denying Motion to Dismiss for Violation of Right to Due Process and/or Right to be Free from Double Jeopardy is REVERSED.

IT IS FURTHER ORDERED that Municipal Court of the City of Billings, Case No. TK 2016-4035, is DISMISSED with prejudice because retrying Huertas would violate his constitutional right to be free from double jeopardy.

18

The Clerk is directed to provide a true copy of this Opinion and Order to all counsel of record, to the Clerk of the Thirteenth Judicial District, the Clerk of the Billings Municipal Court, and to the presiding judges.

DATED this 31st day of October, 2017.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA