

DA 07-0421

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 94

STATE OF MONTANA,

   Plaintiff and Appellee,

 v.

DONALD CATES,

   Defendant and Appellant.

APPEAL FROM: District Court of the Tenth Judicial District,
       In and For the County of Fergus, Cause No. DC 2005-064
       Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

     Torger Oaas, Attorney at Law, Lewistown, Montana

   For Appellee:

     Hon. Steve Bullock, Montana Attorney General, Sheri K. Sprigg,
     Assistant Attorney General, Helena, Montana

     Thomas P. Meissner, Fergus County Attorney, Lewistown, Montana

          Submitted on Briefs: February 11, 2009

              Decided: March 31, 2009

Filed:

    _____
         Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Donald Cates (Cates) appeals the denial of his motion to dismiss in the Tenth Judicial District Court. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On September 16, 2005, a woman contacted the Lewistown Police Department to report that her 16-year-old daughter, S.C., had been raped. S.C. was subsequently interviewed by the police. Initially she stated that she did not know the person who raped her, but later stated that Cates forced her to have sexual intercourse without her consent and had penetrated her. On September 17, 2005, Cates was interrogated by Officer Stacy Danzer (Officer Danzer) at the Lewistown Police Department about these allegations. Cates was 17 years old at the time. Prior to the interrogation, Officer Danzer advised Cates of his *Miranda* rights but did not properly advise him of his right to parental notification under § 41-5-331(1)(b), MCA, which reads as follows:

> When a youth is taken into custody for questioning upon a matter that could result in a petition alleging that the youth is either a delinquent youth or a youth in need of intervention, the following requirements must be met:
>
> .  .  .
>
> (b) The investigating officer, probation officer, or person assigned to give notice shall immediately notify the parents, guardian, or legal custodian of the youth that the youth has been taken into custody, the reasons for taking the youth into custody, and where the youth is being held. If the parents, guardian, or legal custodian cannot be found through diligent efforts, a close relative or friend chosen by the youth must be notified.

¶3 The interrogation between Officer Danzer and Cates was videotaped. During the interrogation, Cates signed a written waiver of his *Miranda* rights and agreed to speak

2

with Officer Danzer. However, Cates also told Officer Danzer that he wished to speak with his parents during the interview. In spite of this request, Officer Danzer continued with the interrogation of Cates, and Cates made several statements which were potentially incriminating.

¶4 On September 19, 2005, Cates was charged in Fergus County District Court with one count of sexual intercourse without consent. Subsequent investigation of Cates led the police to believe that Cates had committed the offense of sexual intercourse without consent on multiple occasions against a total of 5 teenage girls, including S.C. Accordingly, the Fergus County Attorney filed an Amended Information on October 31, 2005, charging Cates as an adult with 10 counts of sexual intercourse without consent, and one count of attempted sexual intercourse without consent.

¶5 One of the alleged victims was K.K., a female who was 15 years old at the time of the alleged crime. Two of the sexual intercourse without consent charges were based on alleged offenses committed against her on April 17, 2005, and May 1, 2005. Two of the other sexual intercourse without consent charges were based on acts purportedly committed against S.C. on September 16, 2005. After the alleged sexual crimes had been committed against S.C. on that date, she underwent a forensic rape exam at the Central Montana Medical Center. The rape kit containing evidence from this exam was subsequently delivered to Officer Danzer. On September 17, 2005, the police also recovered a used condom from K.K.'s residence which had been allegedly used by Cates in the rape of S.C. The condom was also delivered to Officer Danzer.

3

¶6 A jury trial was eventually scheduled for December 4, 2006. Cates was represented by attorneys Torger Oaas (Oaas) and R. Allen Beck (Beck). Previously, on January 10, 2006, this Court decided *State v. McKee*, 2006 MT 5, 330 Mont. 249, 127 P.3d 445. In *McKee*, we held that failure of law enforcement to comply with § 41-5-331(1)(b), MCA, requires the suppression of any statements made by a youth during custodial interrogation. *McKee*, ¶ 26. Even though Cates' counsel could have moved to suppress the videotaped interrogation of Cates in light of *McKee*, Cates' counsel did not do so for tactical reasons. As Cates' counsel later explained, they believed that the videotaped confession was actually exculpatory and that an examination of the videotape would show that Officer Danzer misrepresented statements made by Cates during the interrogation in a police report she later prepared. Cates' counsel also reasoned it would be better for their defense to play the videotape at trial, than have Cates himself testify.

¶7 During opening statements, the prosecution described to the jury how Cates allegedly raped the five teenage girls referenced in the Amended Information. The prosecution also discussed Cates' videotaped confession, and referred to portions of the videotape which it argued were incriminating.

¶8 On the morning of day three of the trial, K.K. took the witness stand and testified about her relationship with Cates. K.K. testified that she and Cates dated from February 2005 to September 2005, and that Cates had forced her to have sexual intercourse against her will during course of their relationship. Since the Amended Information only alleged that Cates committed a sexual offense against on K.K. April 17, 2005, and May 1, 2005,

4

Cates' defense counsel objected that K.K.'s testimony violated M. R. Evid. 404, which prohibits testimony about prior bad acts. The District Court overruled the objection at the time, but granted a request from Cates' counsel to be heard later outside the presence of the jury on a motion for a mistrial.

¶9 K.K.'s testimony concluded around noon on the third day of trial. After she finished, the District Court dismissed the jury for lunch and heard Cates' motion for a mistrial. Outside the presence of the jury, Cates noted that the Amended Information charged two counts of sexual intercourse without consent for acts committed on K.K. on April 17 and May 1, 2005. Cates asserted that K.K.'s testimony referenced other instances of forced sexual intercourse between February 2005 and September 2005, while they were dating. Because the State failed to provide the required notice of its intent to introduce evidence of other crimes or bad acts with respect to K.K. pursuant to *State v. Just*, 184 Mont. 262, 602 P.2d 957 (1979), *modified by State v. Matt*, 249 Mont. 136, 814 P.2d 52 (1991). Cates argued that the prosecution's actions constituted "clear cut" reversible error, warranting a mistrial.

¶10 After argument for a mistrial on this basis, Cates then presented a second motion for a mistrial to the District Court. During the State's direct examination of K.K., the following exchange occurred:

> [Prosecution]: What's the number-one rule that I told you about testifying?
> [K.K.]: Calm down. Don't talk about Defendant's prior—
> [Prosecution]: Well, no that's not what I am thinking about. I am thinking of telling the truth.
> [K.K.]: Yes, the truth, the whole truth, and nothing but the truth.

5

¶11    Cates argued the prosecution asked this question of K.K. expecting to get the answer she gave, and that such action constituted prosecutorial misconduct as it was improper vouching for the veracity of the witness. Accordingly, Cates argued this action by the prosecution constituted reversible error and an additional ground for a mistrial.

¶12    The Court then recessed for lunch, reconvening at around 1:20 p.m. outside the presence of the jury. At that time, the prosecution team of Fergus County Attorney Thomas P. Meissner (Meissner) and Deputy County Attorney Monte Boettger (Boettger) raised the possibility that a mistrial might be required based on references made to the videotaped confession in their opening statement. Meissner observed to the District Court that the videotaped confession was likely inadmissible under *McKee*. Meissner indicated that he just realized this the previous evening while watching a redacted version of the videotape which had been prepared for trial by Boettger. Meissner noticed that Cates had requested to speak with his parents during the interrogation by Officer Danzer. Meissner claimed that this "rang a bell" for him and led him that very morning to conduct research on this issue. In the course of his research, he came upon *McKee* and realized its potential impact on the trial. After discussing the matter, Meissner and Boettger contacted Musselshell/Golden Valley County Attorney Kent Sipe (Sipe), whom they knew personally from the time that he served in the Fergus County Attorney's Office, for assistance in researching the legal implications of the videotaped confession on the trial. In particular, Meissner informed the District Court that the State was concerned about the fact that references to the videotaped confession during opening statements by the prosecution would constitute either reversible or plain error in light of the fact that such

6

evidence would be inadmissible against Cates. As reflected in the transcript of the proceedings, the following exchange then occurred among Boettger, Meissner, Oaas, Beck, and the District Court:

> MR. MEISSNER: Basically, it appears to us that the confession is inadmissible because [Cates] was not advised of his right to contact his parents, so what Monte [Boettger] and I did we talked about that first thing this morning and called Kent [Sipe] and asked Kent to do some research on it, you know, to see, you know, whether something like that is—of course, you know, we had some comments in opening statements about that, whether or not that would be reversible error, and Allen [Beck] is shaking his head over there.
>
> I don't know if you guys knew it or not but—but—so that's really a problem with the record, and I guess in talking about it and I guess in view of the current motion for mistrial I am not sure that we are going to oppose the motion for mistrial.
>
> MR. BOETTGER: If I could add, Your Honor, the problem is, you know, the defense certainly has an obligation to raise motions to suppress evidence and they should have in this case in our view on that, but that isn't—the fact that they didn't isn't a waiver.
>
> THE COURT: Sure.
>
> MR. BOETTGER: That would be—we believe the short research we have been able to get done it would be plainer and would be revealable even if it's not rape and the problem is if we don't offer the—we can't—we don't believe we can offer that tape but in my own mind I made repeated and detailed references to the Defendant's alleged confession—all of which we don't obviously offer any evidence on—is still out there.
>
> THE COURT: Sure. So there is no opposition to the motion for a mistrial?
>
> MR. MEISSNER: Well, I guess we don't want to—we don't want to—a sloppy record that's going to cause that anyway, I guess, and I don't know. I think there is enough of a concern that maybe that's the state of it now.
>
> THE COURT: Well, my only—the only reason I made you repeat that is because I—I would prefer that we have a mistrial on an appropriate issue and I just don't know whether this last issue raised by Mr. Oaas is grounds for a mistrial or not and if we are going to have a mistrial I would rather do it on this basis than one I have not researched or have a, you know, have grounding for.
>
> I don't know if that makes a big difference in the scheme of things but—Mr. Oaas.
>
> MR. OAAS: I have nothing to say, Your Honor.

7

THE COURT: All right. Mr. Beck.

MR. BECK: Yes, I have something to say. First . . . [t]he fact that the State came forward as it has I think only reinforces my opinion that . . . truly seeking the truth and I want to thank them for it and I appreciate it.

THE COURT: Okay.

MR. MEISSNER: I would say that we did speak with Kent Sipe over the noon hour and he was actually in the Yellowstone County Attorney's Office with a friend he had down there named Chris and they had been talking about it this morning and gave us some advice and they—they thought that it would be a plain error kind of thing if that confession did come into evidence and the cite is State versus McKee, decided in January of this year, 330 Mont. 249, and I think it pretty clearly says that if the youth is not advised of the right to parental notification any statements made are suppressible.

THE COURT: Okay. All right. I will declare mistrial, and then if there is anything else after we send the jury home that you need to put on the record we will do so. I—I extend the same kudos to you two as Mr. Beck. Once again, you showed fine, professional conduct. I know it's not easy for you.

¶13 The jury was then dismissed, and the parties reconvened in court. The District Court asked the prosecution if it had anything further to add. The State then requested a scheduling conference and indicated that it would seek to re-file the charges against Cates. Oaas expressed concerns that such action would violate his client's rights against double jeopardy. The District Court agreed that double jeopardy concerns were potentially present, and advised counsel for both parties to brief the double jeopardy issue.

¶14 Cates subsequently filed a motion to dismiss the Amended Information on double jeopardy grounds. After the issues raised by the motion were fully briefed, the District Court held a hearing on February 14, 2007. At the hearing, both sides presented argument and Sipe was called to testify by the State to explain his role in assisting the State with research on the *McKee* issue. Sipe testified that one of the chief concerns

8

driving his research on the admissibility of the videotape was whether the failure to seek its suppression was a legitimate trial tactic or constituted ineffective assistance of counsel. At any rate, Sipe concluded from his research—and advised the prosecution team—that it would be reversible error for the District Court to continue with the trial of the case under its present posture, given the references to the videotaped confession in opening statements.

¶15 In support of his motion, Oaas made it clear that defense counsel's failure to move for suppression of the videotape was a trial tactic because: (1) the defense could use the tape in lieu of Cates himself testifying; (2) the videotape would assist in impeaching the testimony of Officer Danzer; and (3) the tape only referenced the "least credible" of Cates' alleged victims. Furthermore, Oaas argued that the videotape did not actually constitute a confession by Cates, and that Officer Danzer misrepresented the "confessional" nature of the interrogation in an investigative report she prepared. Additionally, Cates argued that the prosecution was simply "goading" Cates into obtaining a mistrial. Oaas argued that the prosecution wanted a mistrial, and a chance to retry Cates on the charges, due to infirmities in its case. These infirmities included the State's failure to submit either the used condom or the rape kit to the State Crime Lab for testing, the compromised credibility of one of the State's key witnesses, contradictions in the testimony of Officer Danzer, and the allegation that the State intentionally sought testimony from K.K. concerning Cates' prior bad acts in violation of M. R. Evid. 404(b) and *Just* notice requirements.

9

¶16 On April 2, 2007, the District Court denied Cates' motion under the authority of *State v. Carney*, 219 Mont. 412, 714 P.2d 532 (1986). Under this authority, a second criminal trial of Cates would be barred unless there was a " 'manifest necessity' to terminate the trial or [the] defendant acquiesced in the termination." *Carney*, 219 Mont. at 417, 714 P.2d at 535. The District Court noted that there were two defense mistrial motions presented to it, and that neither of them was explicitly ruled upon. Instead, the District Court observed that it had wanted to declare a mistrial on an "appropriate issue." The District Court went on to note that neither party took a definitive stand with respect to the motion for a mistrial, and that the State itself never explicitly moved for a mistrial on the basis of *McKee*. The District Court then clarified the grounds for the declared mistrial as follows:

> The Court's intent and purpose for declaring a mistrial was to stop a trial which was in a position where the existence of an alleged confession had been repeatedly made known to the jury, yet the evidence about that confession was inadmissible pursuant to *McKee*. This Court's observation and conclusion is clearly and convincingly that both sides acquiesced in the Court's *sua sponte* declaration of a mistrial. Neither party objected. Because the standards cited above require focus on the Defendant, the Court notes that the Defendant gained what he wanted, with cream on the cake, a mistrial and a tactical advantage regarding possible double jeopardy.

¶17 The District Court concluded that Cates' retrial would not be barred under *Carney* based on his acquiescence to the termination of the proceedings. Even though the District Court concluded that Cates' acquiescence was sufficient to deny his double jeopardy argument, it then went on to analyze Cates' motion under the "manifest necessity" standard as well. Under this standard, a trial may be " 'discontinued when

10

particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice.' " *Carney*, 219 Mont. at 417, 714 P.2d at 535 (quoting *Wade v. Hunter*, 336 U.S. 684, 690, 69 S. Ct. 834, 838 (1949)). In this regard, the District Court concluded that the "particular circumstances surrounding the numerous references to confession and the inadmissibility of that confession created a legal pivot point such that the ends of justice would clearly have been defeated if the trial had continued." Thus, manifest necessity for a mistrial was present.

¶18   Additionally, the District Court rejected Cates' argument that he had been "goaded" into a mistrial or that the State was trying to maneuver the court into declaring a mistrial to achieve a second, better opportunity to convict Cates. The District Court found that the prosecution team had acted professionally and that none of the alleged evidentiary infirmities in the prosecution's case had motivated it to seek a mistrial. Instead, the District Court determined that the "facts and circumstances clearly and convincingly demonstrate that the matter was not a maneuvering but a legitimate, trial-time bomb which the State strongly believed required Court attention and action." Thus, the District Court concluded that there existed manifest necessity to declare a mistrial, and that this fact as well as Cates' acquiescence in the proceedings rendered double jeopardy concerns inapplicable.

¶19   Cates now appeals the denial of his motion to dismiss, presenting the following issue on appeal:

11

¶20 *Did the District Court abuse its discretion in declaring a mistrial, and did it err in concluding that Cates' constitutional right to be free from double jeopardy did not bar his retrial?*

## STANDARD OF REVIEW

¶21 A trial court's decision to declare a mistrial is reviewed for an abuse of discretion. *State v. Flores*, 1998 MT 328, ¶ 12, 292 Mont. 255, 974 P.2d 124 (citing *State v. Moran*, 231 Mont. 387, 389, 753 P.2d 333, 336 (1988)). If a trial judge acted rationally and responsibly in declaring a mistrial, we will affirm his or her decision. *Flores*, ¶ 12.

¶22 A district court's denial of a motion to dismiss criminal charges on double jeopardy grounds presents a question of law which we review for correctness. *State v. Maki*, 2008 MT 379, ¶ 9, 347 Mont. 24, 196 P.3d 1281 (citing *State v. Cech*, 2007 MT 184, ¶ 7, 338 Mont. 330, 167 P.3d 389).

## DISCUSSION

¶23 Cates argues that the District Court erred in denying his motion to dismiss. Even though he did initially raise the prospect of a mistrial, Cates asserts that the District Court actually declared a mistrial sua sponte. He also asserts that he did not consent to the mistrial. Accordingly, Cates maintains that the declaration of a mistrial withstands scrutiny only if it is supported by manifest necessity.

¶24 Cates maintains manifest necessity is lacking in this case. He argues that in granting a mistrial the District Court simply bailed out the prosecution from a situation in which it would not be able to produce evidence which it referred to in opening statements, and also provided the State an opportunity to have the rape kit and used

condom analyzed by the State Crime Lab. In this connection, Cates asserts that the prosecution's reference to the videotaped confession in its opening statement was really not that significant as the prosecution only referred to the confession on a limited basis. Instead, the real problem with the case was the prosecution's failure to have evidence tested for use at trial and properly support its case—a situation which has now been remedied by the declaration of a mistrial and the opportunity to retry Cates on the charges contained in the Amended Information.

¶25 Cates also asserts that any silence or failure to object to the mistrial does not equate to consent, and that because he did not consent to the mistrial, double jeopardy protections prevent him from being prosecuted anew on the charges in the Amended Information. Cates asserts that his position is supported by the weight of authority from other jurisdictions such as *State v. Fenton*, 506 P.2d 665 (Ariz. App. 2 Div. 1973), *Curry v. Sup. Ct. of the City and Co. of San Francisco*, 470 P.2d 345 (Cal. 1970), and *State v. Werneth*, 611 P.2d 1026 (Idaho 1980), which hold that silence or failure to object does not constitute consent to a mistrial.

¶26 The State urges us to affirm, claiming that double jeopardy protections do not bar Cates' retrial on the charges since manifest necessity to declare a mistrial was present based on the prosecution's references to the inadmissible videotaped confession during opening statements. The State, citing to *Carney*, also asserts that the double jeopardy clause does not bar Cates' retrial because he acquiesced in the termination of the proceedings. In this connection, the State argues that we examined the question of defense acquiescence to a mistrial in *Keating v. Sherlock*, 278 Mont. 218, 924 P.2d 1297

13

(1996), and that *Keating* supports the conclusion that Cates acquiesced to a mistrial under the circumstances of this case. In particular, the State notes that Cates was the party who originally moved for a mistrial and termination of the proceedings. Furthermore, the State asserts that once the District Court made clear its intention to declare a mistrial, Cates was given ample opportunity by the District Court to withdraw his motion for a mistrial, study the matter further, or raise an objection. However, Cates did not avail himself of these opportunities. When given the opportunity to speak, in fact, one defense attorney affirmatively declined to make any objections or express any concerns. In light of these circumstances, the State argues that the District Court's factual findings that Cates acquiesced to the termination of the proceedings were not clearly erroneous and must be accepted.

¶27 Additionally, the State argues that Cates can be retired for these offenses because he waived his right to object to the termination of the proceedings pursuant to § 46-11-503(2)(a), MCA. This statute states in pertinent part the following:

> (2) A prosecution based upon the same transaction as a former prosecution [which was terminated for reasons not amounting to an acquittal] is not barred when:
> (a) the defendant consents to the termination *or waives the right to object to the termination* . . . .

Section 46-11-503(2)(a), MCA (emphasis added).

¶28 Finally, the State urges this Court to reject Cates' argument that his silence or failure to object to the mistrial was insufficient to constitute acquiescence to the mistrial. The State asserts that the cases relied upon by Cates for this argument are all distinguishable.

14

¶29 In reply, Cates asserts that *Keating* is distinguishable and repeats his argument that he did not consent to the District Court's sua sponte declaration of a mistrial, and that there was not manifest necessity to grant a mistrial. Cates argues a retrial would simply give the State a second, better chance to convict him and to do so would violate his right to be free from double jeopardy.

¶30 The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, and Article II, Section 25 of the Montana Constitution, protect citizens from being placed twice in jeopardy for the same offense. Jeopardy attaches once a jury is sworn and impaneled. *Carney*, 219 Mont. at 417, 714 P.2d at 535. As the United States Supreme Court has explained,

> [u]nderlying this constitutional safeguard is the belief that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

*United States v. Dinitz*, 424 U.S. 600, 606, 96 S. Ct. 1075, 1079 (1976) (quoting *Green v. United States*, 355 U.S. 184, 187-88, 78 S. Ct. 221, 223 (1957)).

¶31 Moreover, when a mistrial has been declared after jeopardy attaches, "the defendant's 'valued right to have his trial completed by a particular tribunal' is also implicated." *Dinitz*, 424 U.S. at 606, 96 S. Ct. at 1079 (quoting *Wade*, 336 U.S. at 689, 69 S. Ct. at 837).

¶32 In this case, there is no question that jeopardy attached to the proceedings against Cates and that a mistrial was declared. Thus, Cates' right to be free from double jeopardy

15

is clearly implicated. The question is whether Cates' right against double jeopardy under the state and federal constitutions prevents him from being retired on the charges set forth in the Amended Information.

¶33 In *Carney* we held that a "second criminal trial is barred unless there was a 'manifest necessity' to terminate the trial *or [the] defendant acquiesced in the termination.*" *Carney*, 219 Mont. at 417, 714 P.2d at 535 (emphasis added) (citing W. LaFave & J. Israel, *Criminal Procedure* § 24.1(d) at 901 (1985)). "Manifest necessity" is present when "particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice." *Carney*, 219 Mont. at 417, 714 P.2d at 535 (quotation omitted); *accord Moran*, 231 Mont. at 389, 753 P.2d at 334-35.

¶34 The District Court denied Cates' motion to dismiss in part on the grounds that he acquiesced to the mistrial. In *Keating*, we equated acquiescence with "implied consent," and seemingly endorsed the view that implied consent or acquiescence to the termination of trial proceedings can be inferred from a defendant's "statements or silences" or a failure to object to the termination. *Keating*, 278 Mont. at 227-229, 924 P.2d at 1302-03 (discussing *United States v. Smith*, 621 F.2d 350 (9th Cir. 1980)). As Cates notes, some courts are critical of the notion that "acquiescence" or "mere silence or failure to object to the jury's discharge" is sufficient to constitute a waiver of double jeopardy protections. *See Fenton*, 506 P.2d at 667. In fact, LaFave and Israel, the legal progenitors of the "acquiescence" or "implied consent" standard in Montana law, are critical of this approach as well. *See* Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* § 25.2(a), 650-51 (2d ed., West 1999) (quotation omitted) ("This readiness of many

16

courts to engraft upon the consent doctrine notions of tacit consent or constructive consent that expand the concept far beyond its justifiable limits has been rightly criticized.").

¶35 At the same time, other courts have concluded that if the totality of the circumstances and the affirmative conduct of the defendant show that she waived her right to object to the termination of the proceedings, then double jeopardy protections will not bar her retrial. *See Werneth*, 611 P.2d at 1028; *Curry*, 470 P.2d at 348; *Marshall v. Ohio*, 443 F. Supp. 2d 911, 917-18 (N.D. Ohio 2006); *see also Peretz v. United States*, 501 U.S. 923, 936, 111 S. Ct. 2661, 2669 (1991); *In re Shale*, 158 P.3d 588, 594 (Wash. 2007); 63 A.L.R.2d 782, § 3[b], 464-65 (West Supp. 2008). More importantly, § 46-11-503(2)(a), MCA, specifically provides that a prosecution based upon the same transaction as a former prosecution which was terminated for reasons not amounting to an acquittal is not barred if the defendant consents to or waives his or her right to object to the termination of the proceedings. *See* ¶ 27. Accordingly, if the totality of the circumstances and the affirmative conduct of the defendant show that she waived her right to object to the termination of trial proceedings, then a retrial will not be barred on double jeopardy grounds.

¶36 In the present case, the totality of the circumstances demonstrates that Cates affirmatively waived his right to object to the termination of the proceedings. During the relatively brief colloquy with the District Court, which was initiated by Cates, Cates himself put forth two separate mistrial motions before the District Court declared a mistrial. This conduct demonstrated that he was clearly willing to give up his "valued

17

right to have his trial completed by [the] particular tribunal" which was sworn and impaneled in this case, which right is at the core of the constitutional protection to be free from double jeopardy. *See Dinitz*, 424 U.S. at 606, 96 S. Ct. at 1079. Furthermore, once the District Court made it clear to all parties that it was granting a mistrial sua sponte on the grounds suggested by the prosecution, the District Court did not attempt to rush the declaration of the mistrial, and specifically gave Oaas and Beck a chance to be heard, or voice an objection. At that point, Cates' counsel could have withdrawn their previous motions or voiced an objection to the mistrial. Instead, Oaas affirmatively offered that he had nothing to say, and Beck thanked the prosecution team for coming forward. This constitutes an affirmative demonstration, and not mere silence or passive assent that Cates was voluntarily relinquishing his right to proceed before this jury, and waiving his right to object to the termination of the proceedings. *See Dinitz*, 424 U.S. at 608-09, 96 S. Ct. at 1080. Thus, under § 46-11-503(2)(a), MCA, his retrial on the charges in the Amended Information is not barred, and the District Court did not err in denying his motion to dismiss. [1]

¶37    Finally, we recognize that the District Court also determined that "manifest necessity" required termination of the proceedings. We conclude that it was unnecessary for the District Court to reach this question in light of the circumstances here presented, and decline to rely upon such grounds for our decision.

---

[1] In this connection, it is worth noting that Cates has not challenged the constitutionality of § 46-11-503(2)(a), MCA, at any point in these proceedings.

18

¶38    In his Dissent, Justice Leaphart argues that a defendant should not be deemed to waive an objection to a mistrial unless there is "a specific, on-the-record waiver from the defendant himself." (Leaphart Dissent, ¶ 64). Justice Leaphart also asserts that, contrary to the District Court's conclusion, the element of manifest necessity is "completely lacking," and therefore the "acquiescence/consent prong must be all the more compelling; that is consent must be explicit, on-the-record and from the defendant himself." (Leaphart Dissent, ¶ 67.)

¶39    We note that these arguments were not raised by Cates, either in the District Court or on appeal. Nonetheless, the concerns raised by Justice Leaphart, and similar ones raised by Justice Nelson in his Dissent, are valid. But what makes this case unique and anomalous from a double jeopardy perspective is the fact that Cates had two mistrial motions on the table at the time the District Court decided to declare a mistrial sua sponte—a fact the Dissents tend to ignore. This is *the* critical factor in our disposition of this matter; were this not so, our decision might indeed be different. Cates' pending mistrial motions indicate unequivocally that he was giving up his valued right to have the particular tribunal sworn and impaneled in this case try the matter, with the possibility that he would have to face another jury in the future. *See United States v. Razmilovic*, 507 F.3d 130, 141 (2d Cir. 2007) (quotation omitted) ("[W]hen the defendant requests a mistrial, he is deemed to have deliberately elected to forgo his valued right to have his guilt or innocence determined before the first trier of fact.").

¶40    Here, Cates never withdrew his mistrial motions or otherwise indicated to the District Court that he was now changing course and wanted to have the original tribunal

19

determine his guilt. Thus, the situation before the Court is a far cry from those scenarios in which the defendant's willingness to forgo double jeopardy protections is questionable or unknown. In *Razmilovic*, for instance, one of two co-defendants in a criminal trial initially requested a mistrial based on a deadlocked jury, but then immediately sought to poll the jury with respect to their deliberations as to his guilt before any mistrial motion was finalized. *Razmilovic*, 507 F.3d at 141. The trial court hurriedly went ahead with the mistrial nonetheless and did not give co-defendant's counsel the opportunity to poll the jury or finalize its position with regard to the mistrial. The Second Circuit held that retrial of the co-defendants was barred because counsel's actions indicated that he was unsure if he really wanted a mistrial after all, and thus the co-defendant did not "deliberately forego[] his right to have his guilt determined by his original tribunal." *Razmilovic*, 507 F.3d at 142. Having already twice expressed his willingness to terminate the proceedings by putting forth two mistrial motions, Cates never wavered nor expressed any misgivings, even when given the opportunity to do so. Thus, we conclude that under these particular circumstances Cates waived his right to object to the termination of the proceedings.

## CONCLUSION

¶41    We decide this case based solely and specifically upon the circumstances leading to the declaration of the mistrial in this case, including the fact that Cates twice moved for a mistrial during the District Court's brief colloquy with counsel, and that he affirmatively declined when offered the opportunity to object to the District Court's declaration of a mistrial. We decline to address here whether silence or passive

20

acquiescence to a mistrial declaration can overcome a defendant's fundamental right to be free from double jeopardy. We leave this question for a future case, the facts of which place this important constitutional issue squarely before us. Affirmed.

/S/ PATRICIA COTTER

We concur:

/S/ MIKE McGRATH
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice James C. Nelson, dissenting.

¶42    I dissent. Although I agree with the Court's recitation of the well-established legal principles, I strenuously disagree with the Court's application of those principles to the factual circumstances presented here. Moreover, I believe the Court elevates form over substance and overlooks critical facts bearing on the issue of whether Cates consented to or waived his right to object to the termination of his trial.

¶43    I begin by reviewing the circumstances which existed at the time the District Court terminated the trial. It was the third day of trial. Part of Cates' defense was that the prosecution had misrepresented the statements he made to Officer Danzer. Indeed, Cates did not believe he had "confessed" to anything, and he planned to use the videotape of the interrogation in lieu of testifying and for the purpose of challenging the State's case.

21

That morning, K.K. testified that she and Cates had nonconsensual sex "over the entire period" of their relationship, though the Amended Information alleged only two specific instances of nonconsensual sex with K.K. Defense counsel promptly objected and moved for a mistrial, an appropriate course of action in order to preserve this issue for appeal. *See Citizen Advocates For A Livable Missoula v. Missoula City Council*, 2006 MT 47, ¶ 35, 331 Mont. 269, 130 P.3d 1259 ("It is well established that this Court will not review an issue that was not raised in the district court." (internal quotation marks omitted)); *State v. Gomez*, 2007 MT 111, ¶ 21, 337 Mont. 219, 158 P.3d 442 ("The rule is well established that this Court will not address an issue raised for the first time on appeal."). Later, Cates argued that K.K.'s testimony that she had been told by the prosecutor to tell "the truth, the whole truth, and nothing but the truth" was also grounds for a mistrial.

¶44 Meanwhile, during the lunch recess, the prosecution reached the conclusion that certain evidence it intended to introduce at trial (Cates' alleged confession) was not admissible under *State v. McKee*, 2006 MT 5, 330 Mont. 249, 127 P.3d 445, a case decided by this Court 11 months earlier. This put the State in a predicament because one of the prosecutors had mentioned this evidence to the jury in his opening statement. Moreover, the prosecution had assumed it could use Cates' "confession" and, thus, had not sent S.C.'s rape kit and the used condom recovered from K.K.'s residence to the State Crime Lab. The prosecutors acknowledged that Cates had not moved to suppress his statements to Danzer. Nevertheless, believing they could not introduce those statements, the prosecutors sought to abort the trial and start over.

¶45   The District Court decided that Cates had not presented proper grounds for a mistrial and accordingly refused to grant his motions. However, the court decided that it was necessary nonetheless "to stop a trial which was in a position where the existence of an alleged confession had been repeatedly made known to the jury, yet the evidence about that confession was inadmissible pursuant to *McKee*." Although Cates had not objected to the prosecution's references to his alleged confession or contended that his statements to Danzer were inadmissible, the court nevertheless felt that the "particular circumstances surrounding the numerous references to confession and the inadmissibility of that confession created a legal pivot point" which required termination of the trial. The court thus, sua sponte, declared a mistrial for the reasons argued by the prosecutors.

¶46   As an aside, I note the Court's contentions that Cates had two mistrial motions "on the table" at the time the District Court decided to declare a mistral sua sponte, Opinion, ¶ 39, and that Cates' counsel could have "withdrawn their previous motions" for a mistrial once the District Court made it clear that it was granting a mistrial sua sponte, Opinion, ¶ 36. This, the Court states, is "*the* critical factor" in the Court's disposition of this matter. Opinion, ¶ 39. Yet, during the in-chambers conference, the trial judge expressed the view that Cates had not presented proper grounds for a mistrial and, thus, that he would not grant a mistrial on the grounds argued by Cates. Cates' motions, therefore, were no longer "on the table." Indeed, at the hearing on Cates' motion to dismiss, the District Court observed that "there wasn't some sort of mistrial motion by the defense hanging out there that I granted. . . . I think that if -- if anything, it was the Court that basically declared a mistrial based on what was before it, not because of the

23

defense issues regarding testimony that morning or other things." In other words, there were no lingering defense motions to be "withdrawn."

¶47 So, just prior to the court's sua sponte decision to terminate the trial, Cates stood in the following posture. He had preserved for appeal the issue of whether K.K.'s allegedly improper testimony required a mistrial. He now could proceed with the trial—one to which the State had come ill-prepared and in which the prosecution (in Cates' view) had made misrepresentations to the jury during its opening statement. He could put the State to its proof, knowing there were serious defects in the prosecution's case. He could hold the State accountable should it fail to fulfill the promises it had made to the jury. And he could use to his benefit the State's failure to secure critical forensic evidence. Or, alternatively, he could consent to a mistrial on the court's own motion, forgo taking advantage of the defects in the State's case, and thereby subject himself to reprosecution in a second trial (at which time the State, presumably, would not rely on his alleged confession but instead would be prepared to offer the forensic evidence).

¶48 Nothing in the record indicates, let alone affirmatively establishes, that Cates selected the latter option. Indeed, the suggestion that he consented to the termination of his trial by the court sua sponte with the result that the State could reprosecute him after having buttressed its evidence and repaired the defects in its case is utterly absurd. This Court essentially attributes irrational decision-making to Cates and his attorneys.

¶49 It is important to recall that the right under Article II, Section 25 not to "be again put in jeopardy for the same offense previously tried in any jurisdiction" is a fundamental right. *See State v. Tapson*, 2001 MT 292, ¶ 15, 307 Mont. 428, 41 P.3d 305. Moreover,

it is well-settled that courts "should not presume acquiescence in the loss of fundamental rights." *Barker v. Wingo*, 407 U.S. 514, 525-26, 92 S. Ct. 2182, 2189 (1972) (internal quotation marks omitted); *see also Tapson*, ¶ 25 ("This Court will not engage in presumptions of waiver [of one's constitutional rights]."); *State v. Walker*, 2007 MT 34, ¶ 14, 336 Mont. 56, 153 P.3d 614 ("We refuse to presume that a defendant waived a constitutional right."). Waiver is "the voluntary abandonment of a known right." *State v. McCarthy*, 2004 MT 312, ¶ 32, 324 Mont. 1, 101 P.3d 288. Accordingly, before a defendant can waive a fundamental right, such waiver, to be recognized by the courts, must be informed and intelligent, for there can be no waiver by one who does not know his rights or what he is waiving. *McCarthy*, ¶ 32; *Tapson*, ¶ 26.

¶50    In this connection, I agree with Justice Leaphart that, given the fundamental nature of the right not to "be again put in jeopardy for the same offense previously tried," a defendant should not be deemed to have waived the right to object to the termination of his trial absent a specific, on-the-record waiver by the defendant himself. Dissent, ¶ 64. Indeed, it is well-established in our right-of-presence cases that "if a defendant chooses to waive his right to be present at a critical stage of the trial, the trial court must obtain an on-the-record personal waiver by the defendant acknowledging that the defendant voluntarily, intelligently, and knowingly waives that right." *State v. Matt*, 2008 MT 444, ¶ 24, 347 Mont. 530, 199 P.3d 244 (citing *McCarthy*, ¶ 32, *Tapson*, ¶ 28, *State v. Bird*, 2002 MT 2, ¶ 38, 308 Mont. 75, 43 P.3d 266, *State v. Roedel*, 2007 MT 291, ¶ 59, 339 Mont. 489, 171 P.3d 694, and *State v. Aceto*, 2004 MT 247, ¶¶ 45-46, 323 Mont. 24, 100 P.3d 629). The right not to be subjected to double jeopardy is no less compelling or

25

fundamental than the right to be present at a critical stage of the trial. Thus, this standard for obtaining a waiver should apply with equal force in the double jeopardy context. Here, Cates never made an on-the-record personal waiver of his right not to be again put in jeopardy for the same offense previously tried. Accordingly, he cannot be deemed to have waived that right.

¶51 The Court acknowledges these concerns are "valid." Opinion, ¶ 39. Yet, despite the complete absence of an on-the-record personal waiver by Cates, the Court divines that he in fact waived his constitutional right against reprosecution by way of his attorneys' nebulous comments and their supposed "affirmative conduct." With one exception, however, all of the conduct the Court recites is anything but "affirmative." The Court states that Cates' counsel did not withdraw their previous motions. Opinion, ¶ 36. However, as explained above, there were no previous motions to withdraw; and regardless, failing to withdraw previous motions is not "affirmative" conduct. The Court also states that Cates did not voice an objection to the mistrial. Opinion, ¶ 36. But, again, failing to act is not "affirmative" conduct. *Cf. State v. Fenton*, 506 P.2d 665, 667 (Ariz. App. 2d Dist. 1973) ("[M]ere silence or failure to object to the jury's discharge is not such consent as will constitute waiver of a former jeopardy plea."); *Carrillo v. Superior Court*, 52 Cal. Rptr. 3d 614, 623 (Cal. App. 2d Dist. 2006) ("A defendant is under no duty to object in order to claim the protection against double jeopardy and his silence in the face of an ensuing discharge cannot be deemed a waiver."). The Court points out that Oaas "affirmatively offered" that he had nothing to say. Opinion, ¶ 36. However, I fail to understand how "affirmatively offering" nothing to say constitutes

26

"affirmative conduct" amounting to a waiver. As noted by the Court in ¶ 34, the notions of "tacit consent" and "constructive consent" have been rightly criticized. The Court also points out that Beck thanked the prosecutors for coming forward. Opinion, ¶ 36. First, I cannot accept the proposition that civility to opposing counsel constitutes a waiver. Second, Beck's comments do not show that Cates made an informed and intelligent decision to waive a constitutional right.

¶52    Lastly, the Court places great emphasis on the fact that Cates' counsel put forth two separate mistrial motions before the District Court declared a mistrial. Opinion, ¶ 36. Although these motions do not constitute on-the-record personal waivers by Cates himself, the Court states that this conduct demonstrates that he was "clearly willing to give up his 'valued right to have his trial completed by [the] particular tribunal' which was sworn and impaneled in this case." Opinion, ¶ 36 (brackets in Opinion). Yet, even if he was willing to do so at the outset of the colloquy with the District Court, this does not mean he was willing to do so for reasons he neither requested nor wanted. Moreover, circumstances changed during the course of the colloquy, and the Court fails to acknowledge all of the considerations at play for Cates during this period.

¶53    Cates had decided not to file a motion to suppress his statements obtained in violation of *McKee*, electing instead to use the interrogation videotape for his defense. He did, however, decide to raise the issue of whether K.K.'s allegedly improper testimony necessitated a mistrial. Certainly, his decision to do so was a calculated risk. On one hand, the court might grant his motion, in which case he could be retried. But on the other hand, the court might deny his motion, in which case he would have preserved

27

an issue for appeal and could resume his efforts to obtain an acquittal. This latter outcome reflects the position in which Cates stood just prior to the District Court's sua sponte termination of the trial. It is utterly implausible that in making his mistrial motions, Cates accepted the risk that the court would deny those motions (leaving him with a legitimate issue for appeal) but then, sua sponte, terminate the trial because the prosecution, entirely of its own accord, had created what the court believed was a "trial-time bomb"—a circumstance which, again, Cates intended to use to his advantage.

¶54    "The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of [prejudicial judicial or prosecutorial] error." *United States v. Dinitz*, 424 U.S. 600, 609, 96 S. Ct. 1075, 1080 (1976). The considerations which bear on the decision to proceed with the trial or begin the process anew "are peculiarly within the knowledge of the defendant, not the judge, and the latter must avoid depriving the defendant of his constitutionally protected freedom of choice in the name of a paternalistic concern for his welfare." *Carrillo*, 52 Cal. Rptr. 3d at 623 (internal quotation marks omitted). Here, the District Court, after explicitly refusing to grant a mistrial on the grounds argued by defense counsel, took matters into its own hands and terminated Cates' trial on grounds he neither requested nor wanted. Cates did not consent to this action,[1] and he did not waive his right to object to it.

---

[1] Indeed, in denying Cates' posttrial motion to dismiss on double jeopardy grounds, the District Court observed that "there was no defense consent for the mistrial actually declared."

¶55 The Court suggests that when a defendant indicates he is giving up his right to have his trial proceed before the first jury, it is a renunciation of that right for all purposes, unless and until he indicates to the court that he is "now changing course and wants to have the original tribunal determine his guilt." *See* Opinion, ¶¶ 39-40 (citing *United States v. Razmilovic*, 507 F.3d 130 (2d Cir. 2007)). As Justice Leaphart explains below, however, a defendant who makes a motion for a mistrial retains the right to control the course to be followed with respect to *other* errors in the trial. Dissent, ¶¶ 68-69; *see also Dinitz*, 424 U.S. at 609, 96 S. Ct. at 1080. Moreover, the Court cites no authority for the proposition that a defendant's mistrial motion constitutes a waiver for all purposes which must be affirmatively rescinded lest the trial court thereafter abort the trial, sua sponte, on any ground of its choosing.

¶56 *Razmilovic* is readily distinguishable on its facts and does not support the Court's new rule. It is noteworthy, nonetheless, that the *Razmilovic* court held that retrial was barred because the defendant did not "deliberately forego[ ]" his right to have his guilt determined by his original tribunal, *Razmilovic*, 507 F.3d at 142, a showing that certainly does not appear on the record with respect to Cates. In any event, I cannot agree with the notion that after the District Court conveyed its unwillingness to grant defense counsel's motions for a mistrial, Cates was then required to inform the court that he was "changing course" so as to preclude the court from deciding, sua sponte, to terminate his trial on grounds he neither requested nor wanted.

¶57 As a final matter, I note that the District Court's action is not sustainable under the "manifest necessity" doctrine either. Under that standard, "a trial can be discontinued

29

when particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice." *State v. Carney*, 219 Mont. 412, 417, 714 P.2d 532, 535 (1986) (internal quotation marks omitted). This standard contemplates that " 'there are degrees of necessity and we require a "high degree" before concluding that a mistrial is appropriate.' " *Carney*, 219 Mont. at 417, 714 P.2d at 535 (quoting *Arizona v. Washington*, 434 U.S. 497, 506, 98 S. Ct. 824, 831 (1978)). As the Supreme Court explained in *Washington*:

> The question whether that "high degree" has been reached is answered more easily in some kinds of cases than in others. At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence. Although there was a time when English judges served the Stuart monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict, the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn this "abhorrent" practice. . . .
>
> .    .    .
>
> Thus, the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused.
> At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial.

*Washington*, 434 U.S. at 507-09, 98 S. Ct. at 831-32 (footnotes omitted). Since a mistrial declared without the defendant's request or consent implicates his "valued right to have his trial completed by a particular tribunal," *Dinitz*, 424 U.S. at 606, 96 S. Ct. at 1079 (internal quotation marks omitted), a court "must exercise the power to discharge a jury

with the greatest caution, under urgent circumstances, and for plain and obvious cases," *Carney*, 219 Mont. at 418, 714 P.2d at 535 (internal quotation marks omitted).

¶58 Here, the State told the jury in its opening statement about evidence which the State's own "expert" (Sipe) concluded was inadmissible. Prior to this, the State failed to secure forensic evidence which it needed to prove its case. In short, the State came to trial unprepared. Yet, the State now seeks to subject Cates to a second trial not because of any errors caused by or complained of by Cates in the first trial, but because the prosecution figured out on the third day of trial, based on an 11-month-old case, that it had committed what it believed to be "reversible error."

¶59 I cannot agree with the State that the prosecutors, in arguing for a mistrial (or declining to object to one) were not "maneuvering" to achieve a second, better opportunity to convict Cates. That is exactly what they were trying to do, having figured out, belatedly, that they could not use the supposed "confession" they had intended to use in proving their case. As a matter of fact, the District Court explicitly found that both sides were "maneuvering like crazy" and that each party "wanted the mistrial onus to be on the other, and both wanted the onus on the other for tactical reasons, double jeopardy being the quickly obvious one."

¶60 The strictest scrutiny is appropriate when a mistrial is based on the unavailability of critical prosecution evidence. *Carney*, 219 Mont. at 417, 714 P.2d at 535; *Washington*, 434 U.S. at 508, 98 S. Ct. at 832. If Cates is to retain primary control over the course to be followed under these circumstances, then the State cannot unilaterally obtain a mistrial due to its own error in presenting its case. No manifest necessity existed for the District

31

Court's sua sponte termination of Cates' trial. Rather, the court, on its own motion, gave the State a second bite of the apple because the prosecution had created a "trial-time bomb" by coming to trial unprepared to try its case.

¶61 For the foregoing reasons, and based on the record before us, I would hold that Cates did not consent to, or waive his right to object to, the termination of his trial. Nor was there a manifest necessity for terminating it. I would reverse the District Court's Order on Motion to Dismiss/Double Jeopardy and remand this case with instructions to grant Cates' motion to dismiss.

¶62 I dissent.

/S/ JAMES C. NELSON

Justice W. William Leaphart, dissenting.

¶63 I dissent. The right not to "be again put in jeopardy for the same offense" is a fundamental right under Article II, Section 25 of the Montana Constitution. Courts should "not presume acquiescence in the loss of fundamental rights." *Barker v. Wingo*, 407 U.S. 514, 525-26, 92 S. Ct. 2182, 2189 (1972) (citing *Ohio Bell Tel. Co. v. Public Utilities Commn.*, 301 U.S. 292, 307, 57 S. Ct. 724, 731 (1937)). The Court in the present matter has done just that. Based upon one defense counsel's statement that "I

32

have nothing to say, Your Honor" and the other counsel's thanking the State for coming forward with its concerns, this Court presumes that Cates waived his right to object to the District Court's sua sponte declaration of a mistrial. Notably, there is nothing indicating that Cates himself was asked whether he wanted his trial discontinued for the reasons propounded by the State; that is did he want to waive his fundamental right not to "be again put in jeopardy for the same offense?" In the absence of any indication that Cates himself actually consented to the District Court's sua sponte mistrial, the Court picks up its divining rod and goes in search of acquiescence under the "totality of the circumstances" test. Even assuming that such a subjective test is appropriate, the totality of the circumstances shows that once the trial court announced that it was sua sponte declaring a mistrial, the court did nothing more than look at defense counsel and say, "Mr. Oaas." The court did not specifically ask whether counsel (or more importantly, Mr. Cates) objected to the mistrial. Furthermore, there was certainly no inquiry made of the defendant as to whether he wanted to *waive any objection* to the granting of a mistrial upon grounds which would not even remotely satisfy the manifest necessity standard.

¶64 In my view, given the fundamental nature of the Double Jeopardy Clause, a defendant should not be deemed to have waived his objection to a mistrial absent a specific, on-the-record waiver from the defendant himself. *See State v. Bird*, 2002 MT 2, ¶ 38, 308 Mont. 75, 43 P.3d 266 (if a defendant chooses to waive his right to be present at a critical stage of the trial, the court must obtain an on-the-record personal waiver of that right). This would obviate the need to interpret the statements, silence or body language

33

of counsel. In the double jeopardy context, the stakes are too high for such subjective "totality of the circumstances" interpretation.

¶65 The need for an explicit waiver is all the more compelling when, as here, the basis for the mistrial does not even approach the threshold of manifest necessity. Traditionally, manifest necessity requires a "high degree" of necessity due to circumstances not attributable to the state (e.g., the jury is unable to reach a verdict, *U. S. v. Wecht*, 541 F.3d 493 (3d Cir. 2008); a juror is excused due to a language barrier, *U. S. v. Campbell*, 544 F.3d 577 (5th Cir. 2008)). The doctrine of manifest necessity does not allow a party to take advantage of its own mistake or error in, for example, referencing inadmissible evidence. If it did, then the state would essentially be in complete control of when and whether a trial could be aborted. For example, the state might determine that its witnesses were not holding up under cross-examination or that the jurors were not reacting positively to the state's case. In such instances, the prosecutor or one of his witnesses could make an "inadvertent" reference to an inadmissible confession. Having done so, it could then conveniently argue that the record had been poisoned; that the only remedy was a mistrial. The state, through its own conduct, could thereby obtain a new jury and a chance to shore up its evidence. This is precisely the type of maneuvering that the Double Jeopardy Clause is designed to prohibit. In *Illinois v. Somerville*, 410 U.S. 458, 93 S. Ct. 1066 (1973), the United States Supreme Court recognized that a mistrial is constitutionally permissible when there is a fatal defect in the proceedings. For example, declaring a mistrial when a juror was disqualified because he had served on the grand jury, *Thompson v. U. S.*, 155 U.S. 271, 15 S. Ct. 73 (1894), or where the trial judge

34

directed the case moved back to the pleading stage because, after jeopardy had attached, it was discovered that the defendant had not pleaded to the indictment, *Lovato v. New Mexico*, 242 U.S. 199, 37 S. Ct. 107 (1916). While the Court recognized that manifest necessity exists when the prosecution is in a no-win posture because of a legal defect that would provide relief from conviction, this is not inevitably so. Wayne LaFave et al., *Criminal Procedure* Vol. 6 § 25.2(d) 618 (3d ed. West 2008). The United States Supreme Court in *Somerville* cautioned that, "the declaration of a mistrial on the basis of a rule or a defective procedure that would lend itself to prosecutorial manipulation would involve an entirely different question . . . ."

¶66     The concern with prosecutorial manipulation came into play in *Downum v. U. S.*, 372 U.S. 734, 83 S. Ct. 1033 (1963), where the Court held that there was no manifest necessity when the prosecution, knowing that a witness had not been found, proceeded with jury selection and then, when the witness failed to appear, moved for a mistrial due to lack of a crucial witness. Although the prosecutor in *Downum* had not manipulated the motion for a mistrial in order to save a case where he misjudged the strength of the state's evidence, "the mistrial was sought to save a case that appeared to be headed toward an acquittal because of an event the prosecutor could have anticipated. LaFave, *Criminal Procedure* at 618. The *Somerville* majority distinguished *Downum* noting that the mistrial there had "operated as a post-jeopardy continuance to allow the prosecution an opportunity to strengthen its case." *Somerville*, 410 U.S. at 469, 93 S. Ct. at 1073. As in *Downum*, the present case involves a situation which the prosecutor could have and should have anticipated. In light of our decision in *State v. McKee*, 2006 MT 5, 330

35

Mont. 249, 127 P.3d 445, in January of 2006, some eleven months prior to the Cates trial, the State should have anticipated that the statement from Cates after he requested to speak with his parents was clearly inadmissible. Despite this precedent, the State forged ahead and referenced Cates's admissions in its opening statement. The State should not be allowed to bootstrap itself into manifest necessity by references to clearly inadmissible evidence. As set forth above, such a rule is patently subject to manipulation.

¶67 Although the Court carefully relies on acquiescence rather than manifest necessity, I would conclude that where, as here, the element of manifest necessity is so completely lacking, the acquiescence/consent prong must be all the more compelling; that is, consent must be explicit, on-the-record, and from the defendant himself. Vague statements from defense counsel do not suffice.

¶68 I do not agree that Cates, in effect, consented to the court's declaration of a mistrial given that he previously made two motions for mistrial of his own. As the United States Supreme Court noted in *U. S. v. Dinitz*, 424 U.S. 600, 96 S. Ct. 1075 (1976), "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retains primary control over the course to be followed in the event of such error." Under our Court's approach, the defendant, having made a motion of his own has lost the element of control in that he is thereby deemed to have agreed that the proceedings can be aborted for any reason, even a reason not raised in his motion, or more importantly, even a reason which does not remotely suggest manifest necessity.

¶69 As the Court noted in *Dinitz*, the element of control is "error" specific ("the course to be followed in the event of *such* error"). (Emphasis added.) Thus moving for a

36

mistrial on the basis of one alleged error does not amount to consent to a mistrial on an entirely separate error, particularly an error which is entirely of the State's own making. As the present case graphically illustrates, under that scenario, it is the State that is in control.

¶70    This case presents the classic situation where the exception (tacit consent) swallows the rule of no re-trial absent manifest necessity.

/S/ W. WILLIAM LEAPHART